ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| ABENGOA PUERTO RICO, S.E.<br><br>Apelante<br><br>v.<br><br>AUTORIDAD DE ENERGÍA ELÉCTRICA<br><br>Apelado<br><br>AMERICAN INTERNATIONAL INSURANCE COMPANY<br><br>Apelante | KLAN202200660<br><br>Cons.<br><br>KLAN202200663<br>KLCE202201145 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>K AC2000-2759<br><br>Sobre:<br>Incumplimiento de Contrato, Daños y Perjuicios<br><br>Litigación Compleja |
|---|---|---|

Panel integrado por su presidente, el Juez Bermúdez Torres, el Juez Ronda del Toro y la Jueza Martínez Cordero[1].

*Martínez Cordero, Jueza Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 31 de octubre de 2023.

Comparecen ante nos, American International Group of Puerto Rico (en adelante, American International) mediante un recurso de *Apelación* identificado con el alfanumérico KLAN202200660, así como Abengoa S.E. y Abengoa S.A.[2] (en adelante, Abengoa) mediante un recurso de *Apelación* identificado con el alfanumérico KLAN202200663. Nos solicitan la revocación de la *Sentencia Parcial y Orden[3]* emitida el 18 de julio de 2022, notificada al día siguiente por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, foro primario o TPI). Mediante el referido dictamen, el foro primario acogió el *Informe del Comisionado*

---

[1] Mediante la Orden Administrativa Núm. OATA-2023-101 de 2 de junio de 2023, se designó a la Hon. Beatriz M. Martínez Cordero en sustitución de la Hon. Alicia Álvarez Esnard, para entender en los méritos del recurso.
[2] Mediante un contrato denominado *Contrato de Garantía Solidaria*, suscrito el 14 de agosto de 1996, Abengoa S.A. garantizó solidaria e incondicionalmente a la AEE el cumplimiento de Abengoa S.E. de todas y cada una de las obligaciones asumidas en el contrato de obra.
[3] Apéndice 38 del recurso KLAN202200660, a las págs. 1538-1540.

*Especial*, en consecuencia, dictó *Sentencia Parcial* a favor de la AEE por incumplimiento de contrato, desestimó la *Demanda* que presentó Abengoa y declaró Ha Lugar la Reconvención presentada por la AEE. Ordenó, además, la continuación de los procedimientos.

Finalmente, comparece ante nos UNIPRO - Architects, Engineers and Planners (en adelante, UNIPRO), mediante un recurso de *Certiorari* identificado con el alfanumérico KLCE202201145 y nos solicita la revisión de la *Orden*[4] emitida el 14 de septiembre de 2022, notificada el 15 de septiembre de 2022. Mediante el aludido dictamen, el foro primario determinó abstenerse de intervenir hasta tanto este Tribunal de Apelaciones dispusiera del asunto planteado ante sí.

Por encontrarse estrechamente relacionados los recursos del título y en aras de la economía procesal, el 13 de diciembre de 2022, esta Curia emitió una *Resolución* y ordenó la consolidación de los recursos, presentados por American International, Abengoa y UNIPRO, a tenor con las disposiciones de la Regla 80.1 del Reglamento del Tribunal de Apelaciones[5].

Examinados los recursos presentados y con el beneficio de la comparecencia de ambas partes, procedemos a resolver en atención al derecho aplicable.

I

El 1 de mayo de 1996, Abengoa S.A. y la AEE suscribieron un *Agreement* Núm. TSMP-201-004-94[6] (en adelante, Contrato) de obras por precio ajustado de $163,780,000.00, más unas opcionales hasta un precio máximo de $184,313,640.00. El contrato fue redactado en su totalidad por la AEE. El mismo disponía que la AEE emitiría una única *Orden de Proceder* (en adelante, la Orden), una

---

[4] Apéndice del recurso KLCE202201145, a las págs. 599-601.
[5] 4 LPRA Ap. XXII-B, R. 80.1.
[6] Apéndice 42 del recurso KLAN202200660, a las págs. 1547-1620.

vez recibidos los permisos necesarios para la construcción e instalación de la repotenciación de las unidades #5 y #6 de la Central Termoeléctrica de San Juan (en adelante, Proyecto u Obra), entre los cuales se encontraba un permiso que debía otorgar la Agencia de Protección Ambiental de los Estados Unidos (en adelante, EPA). De conformidad con el Contrato, Abengoa estaba obligada a comenzar las obras de construcción dentro de los veinte (20) días de emitida la Orden de Proceder y debía finalizar el Proyecto dentro de los 910 días del comienzo de los trabajos.

Posteriormente, el 6 de mayo de 1997, Abengoa otorgó un subcontrato, *Standard Form Agreement Between Owner and Architect*[7], con UNIPRO – Architetcs, Engineers and Planners, (en adelante, UNIPRO) a los fines de que estos realizaran ciertas obras en el proyecto.

Así las cosas, el trámite judicial comenzó el 24 de mayo de 2000, cuando Abengoa Puerto Rico, S.E. (en adelante, Abengoa S.E.) presentó una *Demanda*[8] sobre incumplimiento de contrato y daños y perjuicios en contra de la AEE. En ella, alegó que la AEE notificó invitación para la subasta núm. LJ-04970 para el Proyecto de repotenciación de las unidades #5 y #6 de la Central Termoeléctrica de San Juan. Sostuvo que, tras la celebración de esta, resultó vencedora la propuesta de la Compañía Mercantil Anónima Abengoa, S.A. Así pues, el 1 de mayo de 1996, Abengoa S.A. y la AEE suscribieron un contrato de obras por precio ajustado de $163,780,000.00, más unas opcionales hasta un precio máximo de $184,313,640.00.

Adujo que, a la luz de unas conversaciones pre-subasta, la AEE le manifestó que la Orden de Proceder debía ser emitida para el mes de julio de 1996. Argumentó que, para la fecha de la

---

[7] Apéndice del recurso KLCE202201145, a las págs. 1-235.
[8] Apéndice 2 del recurso KLAN202200660, a las págs. 8-12.

presentación de la *Demanda*, aún la AEE no había obtenido el permiso de la EPA y no había emitido la Orden de Proceder, habiéndose expirado el plazo contractual original del Contrato. En sustitución, expuso que la AEE lo que efectuó fue una serie de Órdenes de Proceder Parciales relacionadas con labores del Proyecto que no requerían del permiso de la EPA, ni de construcción. Así, expresó que la falta de la emisión de la Orden de Proceder representaba un craso incumplimiento del contrato por parte de la AEE, lo cual resultó en la ocurrencia de daños y perjuicios sufridos por Abengoa.

Adicionalmente, le imputó a la AEE la comisión de los siguientes actos que, a su juicio, eran constitutivos de incumplimiento contractual, a saber:

(1) Demoras e interferencias en la ejecución del Contrato como consecuencia de cambios excesivos en su personal designado para la administración del contrato, lo cual interfirió con la ejecución de los trabajos de Abengoa.

(2) Falta de atender conforme lo dispuesto en el Contrato las numerosas reclamaciones planteadas por Abengoa que surgieron como consecuencia del incumplimiento de la AEE.

(3) La AEE le impuso y/o pretendió imponer modificaciones unilaterales al ámbito de los trabajos de Abengoa bajo el Contrato.

(4) Se negó a reconocer todo derecho de Abengoa bajo el contrato de reclamar costos adicionales que surgieron fuera del pacto contractual.

(5) No le pagó a Abengoa sumas líquidas y exigibles por trabajos ejecutados bajo el Contrato.

(6) Eliminó del contrato la partida de remoción de suelos contaminados con hidrocarburos no ejecutados hasta la fecha y la subastó nuevamente.

En vista de lo anterior, expuso que, efectivo el 22 de mayo de 2000, dio por terminado el Contrato conforme al Artículo 1077 del Código Civil de Puerto Rico.[9] A esos efectos, reclamó daños y perjuicios que ascendían a $835,334,988.00.

Por su parte, el 4 de octubre de 2000, UNIPRO presentó una *Demanda en Intervención*[10] por incumplimiento de contrato, daños y perjuicios contra Abengoa S.E. y la AEE. En síntesis, alegó que Abengoa S.E. subcontrató sus servicios y realizó obras en dicho proyecto. Por lo anterior, solicitó intervención en el pleito y el pago de los servicios prestados, toda vez que sus intereses quedaron afectados con la resolución del contrato. Asimismo, reclamó la suma de $1,205,808.70 por trabajo realizado hasta el 3 de octubre de 2000; la suma de $187,701.60 por concepto de retenido pendiente de pago y; la suma de $1,700,000.00 por los daños sufridos.

Luego de varios trámites procesales, el 3 de marzo de 2003, Abengoa S.E. presentó su *Demanda Enmendada*[11] en la cual reiteró sus planteamientos iniciales. Sostuvo que el proyecto fue subastado como un proyecto "llave en mano" y que la AEE se encargaría de obtener los permisos medioambientales. Asimismo, expuso que durante el proceso pre-subasta la AEE manifestó contar con los permisos de aire y NPDES y que la fecha de comienzo del Proyecto sería el 1 de junio de 1996. Aludió que el contrato contaba con una

---

[9] 31 LPRA sec. 3052, Art. 1077.
[10] Apéndice 3 del recurso KLAN202200660 a las págs. 13-18. Véase, además, apéndice 4 y 5 del apelante, a las págs. 19-28. Respectivamente, Induchem Enviromental Services, Inc, y PASSCO presentaron una *Demanda en Intervención* por incumplimiento de contrato, daños y perjuicios contra Abengoa y la AEE. En síntesis, alegaron que Abengoa S.E. subcontrató sus servicios y realizaron obras en dicho proyecto. En virtud de lo anterior, solicitaron intervención en el pleito y el pago de los servicios prestados, toda vez que sus intereses quedaron afectados con la resolución del contrato.
[11] Apéndice 7 del recurso KLAN202200660, a las págs. 56-63.

fórmula de escalación del precio que se basó en representaciones de la AEE, a los efectos de que los permisos necesarios para el proyecto se obtendrían no más tarde de un (1) año, a partir de dicho contrato.

Detalló, además, que, debido a las órdenes parciales efectuadas por la AEE, el proyecto se convirtió en cinco (5) proyectos separados, aunque interrelacionados. Esbozó que, para el 25 de enero de 1999, la AEE no había obtenido el permiso ambiental de la EPA, en consecuencia, Abengoa S.E. esperó un año y medio adicional por que se emitiera la Orden de Proceder y así culminar la última etapa del Proyecto. Por ello, alegó que se vio obligado a dar por terminado el Contrato, debido a que la Orden de Proceder nunca se emitió. Así pues, planteó que estuvo más de un año y medio solicitando a la AEE que negociase los términos para la extensión del plazo del contrato y se reconociese los daños que había causado por los retrasos en la obtención del permiso de la EPA. En vista de lo anterior, solicitó daños ascendentes a $36,457,740.50.[12]

Por su parte, el 30 de diciembre de 2003, la AEE presentó su *Contestación a Demanda Enmendada y Reconvención Enmendada*[13] en la cual negó la mayoría de las alegaciones. Alegó afirmativamente que Abengoa S.E. conocía que la fecha de comienzo del Proyecto era aproximada y que la obtención de ciertos permisos no tenía fecha cierta, por lo que los derechos adquiridos de Abengoa S.E. y el comienzo del Proyecto estaba sujeto a la obtención de dichos permisos. Asimismo, adujo que las razones para la terminación del contrato eran injustificadas, ilegítimas y constituían un pretexto para eludir sus obligaciones contractuales y no terminar los trabajos contrario a lo convenido. De igual forma, señaló que la dilación en la obtención del permiso ambiental de la EPA no estaba bajo su

---

[12] Apéndice 8 del recurso KLAN202200660, a las págs. 64-66. El 13 de abril de 2004, UNIPRO presentó *Demanda de Intervención Enmendada.*
[13] Apéndice 6 del recurso KLAN202200660, a las págs. 29-55.

control, por lo que no tenía que responder al ser un evento de fuerza mayor. Arguyó que realizó todos los pagos a Abengoa S.E. por los trabajos realizados según establecía el "payment schedule" y que estos no podían abandonar la obra después que se obtuvieron los permisos. Enfatizó que Abengoa S.E. asumió los riegos voluntariamente al terminar el contrato.

En la reconvención esbozó que Abengoa S.E. conocía de la posibilidad de que ocurrieran dilaciones inesperadas en la obtención de los permisos y licencias, lo cual podía retrasar el comienzo del proyecto. Sostuvo que, en el Artículo 1.12 de las Condiciones Generales del Contrato, la dilación en el otorgamiento de los permisos constituía una causa de fuerza mayor.[14] Indicó que dicha cláusula fue incluida tras ser sugerida por Abengoa S.E. Destacó que Abengoa S.E. se aprovechó de las ganancias que había percibido y abandonó el Proyecto luego de haber recibido el 80% del valor total del mismo. De igual forma, esgrimió que no brindó el cuidado necesario a los equipos para su preservación. Por último, razonó que por el incumplimiento de Abengoa S.E. sufrió daños económicos.

Posteriormente, el 18 de mayo de 2004, la AEE presentó una *Demanda contra Terceros*[15] a los fines de incluir a Abengoa S.A., quien suscribió el contrato de obra para el Proyecto de Repotenciación. En específico, mediante un contrato denominado *Contrato de Garantía Solidaria*, suscrito el 14 de agosto de 1996, Abengoa S.A. garantizó solidaria e incondicionalmente a la AEE el cumplimiento de Abengoa S.E. de todas y cada una de las obligaciones asumidas en el contrato de obra. Incluyó, además, a American International, toda vez que fue la compañía que otorgó los *Payment* y *Performance Bonds* que garantizaban el cumplimiento del contrato de obras para el Proyecto de repotenciación.

---

[14] Apéndice 6 del recurso KLAN202200660, a la pág. 37.
[15] Apéndice 10 del recurso KLAN202200660, a las págs. 74-94.

Por su parte, el 26 de octubre de 2004, American International presentó su *Contestación de la Tercera Demandada American International Insurance Company of Puerto Rico a la Demanda Enmendada contra Terceros*[16] en la cual negó la mayoría de las alegaciones. Como defensas afirmativas, arguyó que, debido al retraso en obtener los permisos de las Agencias y la emisión de órdenes parciales, se modificó el Contrato e incrementó sustancialmente los riesgos de American International bajo su fianza de ejecución, lo cual le liberó de sus obligaciones. Es decir, la AEE transformó el Contrato, dando lugar a la novación extintiva del del mismo, por lo tanto, se extinguió la obligación accesoria de American International bajo su fianza de ejecución. A su vez, señaló que la AEE sustituyó a Abengoa S.A. por Abengoa S.E., por consiguiente, American International no podía responder por el incumplimiento de Abengoa S.E. Por otra parte, sostuvo que, conforme al Artículo 15 de las Condiciones Generales del Contrato, no era responsable por pérdidas, ganancias o ingresos o cualquier daño incidental o consecuencial. Por último, enfatizó que Abengoa S.A. realizó varias ofertas a la AEE con la intención de transigir la acción por incumplimiento de contrato, sin embargo, la AEE rechazó dicha oferta, por lo que renunció a la reclamación contra American International.

Así las cosas, el 31 de octubre de 2007, notificada el 6 de noviembre de 2007, el foro primario emitió una *Resolución*[17] en la cual ordenó que se tramitaran los casos del título como casos de litigación compleja. Además, el 7 de julio de 2011, notificada el 12 de julio de 2011, el foro primario emitió una *Resolución*[18] en la cual nombró al licenciado Ángel F. Rossy García (en adelante, Lcdo.

---

[16] Apéndice 11 del recurso KLAN202200660, a las págs. 95-113.
[17] Apéndice 12 del recurso KLAN202200660, a las págs. 114-119.
[18] Apéndice 13 del recurso KLAN202200660, a las págs. 120-130.

Rossy García o Comisionado) como Comisionado Especial en el caso del título.

El 16 de julio de 2010, UNIPRO presentó una *Moción Solicitando Desistimiento Parcial con Perjuicio en Cuanto a la AEE*.[19] Indicó que interesaba desistir con perjuicio de sus reclamaciones en contra de la AEE. No obstante, aclaró que continuaba su reclamación en contra de Abengoa por el dinero adeudado por el trabajo que realizó en el Proyecto. Cónsono con lo anterior, el 5 de agosto de 2010, notificada el 26 de agosto de 2010, el foro primario emitió una *Sentencia Parcial*[20] en la cual declaró Ha Lugar la *Moción Solicitando Desistimiento Parcial con Perjuicio en Cuanto a la AEE*, y, en consecuencia, determinó que UNIPRO desistió con perjuicio su causa de acción en contra de la AEE.

Tras varios trámites procesales, el 8 de julio de 2014, UNIPRO presentó una *Moción en Solicitud de Sentencia Sumaria Parcial a Favor de UNIPRO por las Cantidades Adeudadas por Concepto de Trabajos Realizados en el Proyecto TSMP-201-004-94*.[21] Arguyó que Abengoa les comunicó que cualquier cantidad de dinero adeudada era responsabilidad de la AEE. No obstante, adujo que American International les respondía por ser la fiadora de Abengoa conforme a las órdenes parciales de proceder que emitió la AEE. Por otra parte, esbozó que, según el informe pericial del Profesor Meherwan P. Boyce, UNIPRO realizó las obras para las cuales fue contratada y que las mismas se realizaron de forma correcta, adecuada y razonable. Por último, razonó que la obligación de pagar de Abengoa surgía de un contrato y que no podía negarse a pagar, toda vez que dichos trabajos fueron realizados de forma correcta. Por todo lo anterior, solicitó las sumas adeudadas por concepto de servicios

---

[19] Apéndice del recurso KLCE202201145, a las págs. 641-644.
[20] *Id.*, a las págs. 645-648.
[21] *Id.*, a las págs. 241-391.

prestados y el pago de intereses por mora. Asimismo, pospuso la presentación de su causa de acción en daños y perjuicios y daños morales para la segunda etapa de los procedimientos.

A su vez, el 10 de julio de 2014, notificada al día siguiente, el foro primario emitió una *Resolución*[22] mediante la cual refirió la moción de sentencia sumaria al Comisionado.

Posteriormente, el 3 de septiembre de 2021, UNIPRO presentó una *Solicitud de Orden de Pago de las Cantidades Adeudadas UNIPRO.*[23] Indicó que, American International, fiadora de Abengoa, se había negado a saldar la deuda que tenía pendiente con UNIPRO. Sostuvo que la conducta de Abengoa constituía un craso abuso de posición ante UNIPRO, aun ejerciendo su derecho a retirarse de las negociaciones con AEE. De igual forma, enfatizó que Abengoa había cobrado $160,869,125.55 del precio total del contrato y que dentro de dicha cantidad cobrada se encontraba la suma adeudada a UNIPRO. Por tanto, para esta etapa de los procedimientos solicitó que se ordenara a Abengoa y a American International el pago de $3,846,088.43.

Luego de varios trámites procesales los cuales no pormenorizaremos, y habiendo acaecido un extenso descubrimiento de prueba y la celebración de múltiples vistas, el 22 de julio de 2021, el Comisionado emitió el *Informe del Comisionado al Tribunal*[24] (en adelante, Informe). Según se desprende del *Informe*, en atención a la prueba recibida y la credibilidad que le mereció la prueba testifical, emitió una serie de determinaciones de hecho y conclusiones de derecho.[25] Producto de su *Informe*, emitió un pronunciamiento dispositivo parcial intitulado *Recomendaciones*[26], las cuales transcribimos *in extenso*:

---

[22] *Id.,* a las págs. 649-651.
[23] *Id.,* a las págs. 570-575.
[24] Apéndice 31 del recurso KLAN202200660, a las págs. 1056-1233.
[25] *Id.,* a las págs. 1076-1231.
[26] *Id.,* a la pág. 1231.

1. Declarando y resolviendo que la conducta y proceder incurrida por la parte demandante reconvenida Abengoa P.R., S.E. y la tercero demandada reconviniente Abengoa, S.A., al terminar unilateralmente el contrato entre las partes y abandonar todo trabajo en el Proyecto, en ausencia de incumplimiento o razón justificada alguna por parte de la demandada reconviniente y tercero demandante AEE, menoscabando y afectando en forma sustancial sus intereses y derechos bajo el contrato, constituye un incumplimiento material de sus obligaciones contractuales.

2. Declarando y resolviendo que tanto Abengoa P.R., S.E. como Abengoa, S.A. vienen obligadas a responder solidariamente a la demandada reconviniente y tercero demandante reconvenida AEE, por los daños resultantes de su conducta y proceder, al resolver Abengoa el contrato ausente causa justificada alguna y abandonar el Proyecto, lo que constituye un incumplimiento material de sus obligaciones contractuales. Tal determinación será objeto de consideración y prueba en etapas subsiguientes, según convenido por las partes.

3. Autorizando la continuación del trámite procesal del caso hasta la final resolución de toda controversia pendiente de dilucidación, en lo pertinente a los daños resultantes por el incumplimiento material de sus obligaciones contractuales por parte de Abengoa. También aquellas pendientes de dilucidación en lo atinente a las demás partes activas con interés en el proceso.[27]

En lo pertinente y, en apretada síntesis, el Comisionado expresó:

[…]

[…]realidad es que el contrato formalizado por las partes era un contrato "EPC a precio alzado llave en mano". Conforme al mismo y estando Abengoa obligada a cumplir con todas las exigencias requeridas por la AEE en la documentación técnica de los equipos a proveerse para el proyecto, asumió total responsabilidad para el diseño, ingeniería, fabricación, suministro, transporte, labores de construcción y su supervisión, montaje, pruebas, puesta en operación comercial de los equipos electromecánicos correspondientes para el proyecto de repotenciación objeto del contrato, para garantizar el cumplimiento de una oferta llave en mano. Para ello y por la naturaleza del contrato, control tenía para coordinar y completar los trabajos autorizados en cada

---

[27] *Id.*, a la pág. 1232.

orden de proceder parcial emitida por la AEE, para dar inicio en su momento a la etapa de construcción.[28]

[...]

Responsabilidad absoluta asumió Abengoa, además, por la custodia, almacenaje y mantenimiento de los equipos hasta la tapa de su instalación y cumplimiento sustancial del contrato concluida la etapa de construcción. Iniciado así el desarrollo del proyecto, ello le permitió a Abengoa, según determinado, facturar y cobrar el 77% del precio total del contrato, conforme a la estructura de pagos y fórmula de escalación de precios establecida por Abengoa y que se hizo formar parte del contrato.[29]

[...]

Debemos aquí reiterar que Abengoa, como parte de su estrategia de terminación temprana del contrato en evitación de pérdidas millonarias, al margen de desatender sus obligaciones contractuales en todo lo atinente al almacenamiento, protección y mantenimiento de los equipos, comenzó a facturar y requerir el pago por alegados costos por ésta incurridos como consecuencia de la dilación en la expedición del permiso PSD por parte de la EPA, facturación cuya procedencia y obligación de pago fue reiteradamente rechazada por improcedente por la AEE. Era el criterio de la AEE, según determinado, que tratándose de un contrato "EPC con precio alzado llave en mano", ninguna obligación de pago tenía la Autoridad por el almacenamiento y mantenimiento de los equipos.[30]

[...]

Al margen de lo claramente dispuesto en el referido Artículo 9 de las Condiciones Generales del Contrato, conocimiento tenía Abengoa, o debía tener desde antes de formalizarse el contrato, de la naturaleza del mismo (EPC a precio alzado llave en mano) y los riesgos que estaba asumiendo al obligarse a realizar la obra a precio alzado, con conocimiento de que la fecha para la obtención de los permisos para poder dar inicio a la fase final del contrato, a saber labores de construcción, instalación de equipos, puesta en marcha y pruebas, era incierta. También, que conforme a lo dispuesto en el Artículo 2 del Contrato (Commencement and Completion Work), la fase de construcción que sería objeto de la Orden Final de Proceder a emitirse, "will be issued immediately after receipt of permits necessary for construction and installation of the Project, and Guaranteed Substantial Completion shall be achieved within nine hundred ten (910) calendar days thereafter."[31]

---

[28] *Id.,* a la pág. 1213.
[29] *Id.,* a las págs. 1215-1216.
[30] *Id.,* a las págs. 1219-1220.
[31] *Id.,* a la pág. 1220.

Realidad en el caso que nos ocupa es que Abengoa, con conocimiento del riesgo que estaba asumiendo para el caso de una dilación en la obtención de los permisos para la fase de construcción y con total control del desarrollo de las labores a realizarse previo a la obtención de tales permisos, en su interés de comenzar con la facturación y cobro de tales labores conforme a la estructura de pagos que se hizo formar parte del contrato, y de otra parte la Autoridad para adelantar etapas y labores necesarias previo al inicio de las labores de construcción una vez expedidos los permisos necesarios, adelantando así la pronta terminación del Proyecto, convinieron en iniciar el desarrollo mediante órdenes parciales de proceder según antes determinado.[32]

Le permitió ello a Abengoa comenzar a recibir sus beneficios bajo el contrato facturando y recibiendo a la fecha de la terminación unilateral del contrato en mayo de 2000, el pago del 77% del precio total convenido en el contrato, incluyendo las órdenes de cambio emitidas y aceptadas por Abengoa, ello conforme a la estructura de pagos y fórmula de escalación por ésta propuesta y que se hizo formar parte del contrato, sin haber concluido Abengoa las labores autorizadas y sin haberse dado inicio a la etapa de construcción, cuando conocimiento tenía que era inminente la expedición del Permiso PSD por EPA y los posteriores permisos de construcción.[33]

[…]

[…]Abengoa se obligó bajo los términos del contrato, a realizar todas las labores y trabajos necesarios para la repotenciación de las Unidades 5 y 6 de la Central Termoeléctrica de San Juan según dispuesto en el Artículo 1 del Contrato, lo que incorporamos aquí por referencia. Ello a su vez por un precio alzado de $163,780,000.00 que acordó Abengoa recibir y se obligó la Autoridad a pagar, ello según dispuesto en el Artículo 4 del Contrato. Derecho tenía Abengoa, además, conforme a lo dispuesto en el referido Artículo 4 del Contrato a "any additional amount due to extra work ordered and accepted by the Engineer or deductions due to change orders," dichos pagos por la Autoridad a su vez conforme a la estructura de pagos propuesta por Abengoa y que se hizo formar parte del contrato como Exhibit J-A, precios a su vez ajustados conforme a la fórmula de escalación que se incorporó al contrato como Exhibit F-A. Ninguna otra cláusula fue incorporada al contrato o negociada por Abengoa, en contemplación al riesgo que conllevaba una dilación en la obtención de los permisos para la fase de inicio de las labores de construcción, lo que era incierto y era del conocimiento de Abengoa desde antes de haberse formalizado el contrato. Cualquier otra modificación en el precio alzado convenido por las partes tendría que responder a una Orden de Cambio, bien para reducir o

---

[32] *Id.*, a la pág. 1221.
[33] *Id.*

incrementar las labores de construcción, lo que no es la situación en las referidas facturas y reclamos de Abengoa por costos adicionales incurridos y que fueron desmerecidos y rechazados por la Autoridad según determinado.[34]

De otra parte, obligada venía Abengoa conforme al contrato a entregar a la AEE dos unidades en ciclo combinado completamente funcionales y en operación, con una generación de 464 MW, ello en o antes de 910 días, luego de la emisión de la Orden de Proceder Final para la etapa de construcción una vez obtenidos los permisos correspondientes, los que eran inminentes a la fecha de terminación del contrato por Abengoa, según determinado.[35]

[…]

… [S]iendo la dilación en la obtención de los permisos, e implícito en ello la posibilidad de un aumento en los costos, un riesgo al que está expuesto todo contratista que se obliga bajo un contrato a realizar una obra de construcción a precio alzado, bien pudo Abengoa intentar negociar con la Autoridad una cláusula en el contrato, obligándose ésta a resarcirle los costos adicionales a incurrirse por el almacenaje, custodia y mantenimiento de los equipos, en espera de la obtención de los permisos, para dar curso a la fase de construcción e instalación de equipos en el proyecto, lo que no hizo.[36]

[…]

Somos aquí del criterio y así resolvemos que improcedente resulta la pretensión de Abengoa de desligarse de sus obligaciones bajo el contrato para pasar el costo económico del riesgo por ésta asumido a la Autoridad. Tampoco es permisible la pretensión de Abengoa, como parte de su estrategia de terminación temprana del contrato, aquella de renegociar el precio alzado acordado por las partes para la realización total de la obra y su puesta en marcha, en evitación de las pérdidas millonarias que le representaba concluir el proyecto y cumplir con sus obligaciones, cuando conocimiento tenía que el trámite conducente a la obtención de los permisos estaba en etapa donde la expedición de éstos era inminente, según antes determinado.[37]

[…]

Tampoco puede constituir un incumplimiento sustancial que pueda dar base a la terminación unilateral del contrato por Abengoa, la determinación de la AEE en protección de sus mejores intereses, de sacar a subasta el trabajo adicional de remoción de material contaminado, luego de haberse ejercitado y

---

[34] *Id.*, a las págs. 1222-1223.
[35] *Id.*, a la pág. 1223.
[36] *Id.*, a las págs. 1224-1225.
[37] *Id.*, a la pág. 1225.

pagado a Abengoa la opción que tenía bajo el contrato en lo atinente a la remoción de material contaminado hasta la suma de $15,776,690.[38]

[…]

[R]esolvemos que habiendo ejercitado la AEE su opción bajo el contrato en lo atinente a la remoción de contaminantes y pagado por tal opción el precio total estipulado, y atendidos los términos de la oferta de Abengoa para el proyecto en lo atinente a la remoción de materiales contaminantes, libre quedaba el derecho de la AEE, en protección de sus mejores intereses, para sacar a subasta, en la que podía participar Abengoa, el costo de toda remoción adicional de material contaminado. Lejos de ello y en etapa final la estrategia de terminación unilateral del contrato por Abengoa, aduce en su carta de terminación con total frivolidad, que tal acción y determinación por parte de la AEE, alcanza a un incumplimiento a sus obligaciones bajo el contrato por ésta suscrito[39].

[…]

[E]vidente nos resulta la ausencia de causa justificada para la terminación unilateral del contrato por parte de Abengoa, en total menosprecio de los derechos de la AEE bajo el contrato. Hizo así total abstracción de sus obligaciones con el objetivo de evitar las pérdidas que su falta de pericia en la preparación de su propuesta en lo atinente "al precio de venta competitivo" por ésta determinado y ofertado, sin contar con un análisis ponderado de los costos reales a incurrirse y los riesgos por ésta asumidos en lo atinente a la fecha de obtención de los permisos, la que era incierta, le representaban tratándose de un contrato a precio alzado.[40]

[…]

En el caso que nos ocupa, habiéndose contratado la obra a precio alzado, consideración esencialísima para Abengoa y obligación de la AEE bajo el contrato, era pagar el precio de la obra conforme a la estructura de pagos que se hizo formar parte del contrato y su fórmula de escalación para el caso de dilación en la obtención de los permisos necesarios para dar inicio a la etapa de construcción, también incorporada en el contrato, con lo que cumplió la AEE… brindó la Autoridad según determinado, la colaboración necesaria, libre de costos, para el almacenamiento de los equipos en sus facilidades en Palo Seco, ello bajo la total responsabilidad de Abengoa en todo lo atinente al cuido y mantenimiento de los mismos, para beneficio de Abengoa en el cumplimiento de sus obligaciones bajo el contrato.[41]

[…]

---

[38] *Id.,* a la pág. 1227.
[39] *Id.*
[40] *Id.,* a las págs. 1227-1228.
[41] *Id.,* a las págs. 1229-1230.

Resolvió así unilateralmente el contrato, y abandonó todo trabajo en la obra, encontrándose la AEE en total cumplimiento de sus obligaciones bajo el contrato, y ausente causa alguna por parte de la AEE para justificar tal proceder por parte de Abengoa, todo ello en evitación de pérdidas económicas, las que conforme a los términos del contrato y por sus propios actos, impericias e incumplimientos, eran de su total responsabilidad. Se trata de una conducta y proceder por parte de Abengoa que no tiene lugar en el campo del derecho, la que por ser antijurídica, no puede ser favorecida y debe ser rechazada. Lo contrario sería permitirle a Abengoa beneficiarse de su proceder impropio, invitación que no podemos aceptar y debemos rechazar.[42]

[…]

En conclusión, resolvemos que Abengoa, al desarrollar y ejecutar su estrategia de terminación temprana del contrato en evitación de pérdidas millonarias que le representaba cumplir con sus obligaciones contractuales, con total menosprecio de los derechos e intereses de la AEE bajo los términos del contrato por éstas formalizado, infringió el principio de la buena fe contractual en su relación con la AEE. Resolvemos aquí además, como cuestión de hecho y de derecho, que tal terminación unilateral del contrato por parte de Abengoa y su abandono del Proyecto, ausente incumplimiento alguno por parte de la AEE o razón justificada para tal proceder, constituye un incumplimiento material por parte de Abengoa con sus obligaciones bajo el contrato formalizado por las partes, con derecho ahora la Autoridad a reclamar, los daños resultantes y costos adicionales incurridos por ésta para alcanzar la conclusión del Proyecto.[43]

En desacuerdo con el *Informe* del Comisionado, el 20 de octubre de 2021, Abengoa presentó una *Moción y Alegato de Abengoa Solicitando que se Rechace el Informe del Comisionado Especial y que este Tribunal Adjudique la Responsabilidad Contractual en Base a los Hechos no Controvertidos.*[44] En síntesis, arguyó que el Comisionado tenía el deber de abordar la prueba que se admitió y los argumentos esgrimidos por Abengoa, aunque fueran para rechazarlos según el derecho aplicable. En específico, señaló

---

[42] *Id.,* a la pág. 1230.
[43] *Id.,* a la pág. 1231.
[44] Apéndice 32 del recurso KLAN202200660, a las págs. 1234-1371. Véase, además, Apéndice 33, a las págs. 1372-1448, en el cual American International presentó documento intitulado *Objeciones de AIG al Informe del Comisionado.* Véase, además, Apéndice 35 del recurso KLAN202200660, a las págs. 1451-1518, en el cual la AEE presentó *PREPA'S Reply to Abengoa's and AIG Objections to the Report of the Special* Master.

que el Comisionado actuó arbitrariamente al ignorar la prueba y las estipulaciones de hechos en base a la inferencia infundada de que Abengoa había emitido una especie de "garantía tácita extracontractual" a la AEE para construir el Proyecto por el precio de licitación sin importar el tiempo que le tomara a la AEE obtener los permisos y cuanto ello costara. Razonó que dicha recomendación era arbitraria y los defectos del *Informe* eran graves e insubsanables. Por último, destacó que el foro primario debía acoger las estipulaciones de las partes y presentar un escrito ante dicho foro en el cual esbozaran sus respectivas listas de hechos incontrovertidos, con referencias específicas a la prueba admitida y así adjudicar la responsabilidad contractual como se suponía. Asimismo, solicitó una vista de argumentación oral.

Así las cosas, el TPI celebró una vista argumentativa el 29 de junio de 2022, con relación al *Informe* rendido por el Comisionado. Luego de examinar los argumentos esgrimidos por las partes del título, el 18 de julio de 2022, notificada el 19 de julio de 2022, el foro primario emitió una *Sentencia Parcial y Orden.*[45] Mediante la *Sentencia Parcial*, el tribunal *a quo* acogió el *Informe,* haciéndolo formar parte de la *Sentencia Parcial* emitida. En específico, dictó *Sentencia Parcial* contra Abengoa y a favor de la AEE, por incumplimiento de contrato. En consecuencia, el TPI desestimó la *Demanda* que presentó Abengoa y declaró Ha Lugar la reconvención presentada por la AEE, con relación a la causa de acción de incumplimiento de contrato conforme a la Regla 42.3 de las de Procedimiento Civil.[46] En fin, el TPI, luego de acoger las recomendaciones del *Informe* y dictar *Sentencia Parcial*, ordenó la continuación de los procedimientos.

---

[45] Apéndice 38 del recurso KLAN202200660, a las págs. 1538-1540.
[46] 32 LPRA Ap. V, R. 42.3.

Ante este escenario, y en lo relativo al recurso KLCE202201145, el 5 de agosto de 2022, UNIPRO presentó una *Segunda Solicitud para que se Ordene el Pago a UNIPRO.*[47] En su escrito, reiteró sus argumentos de la *Solicitud de Orden de Pago de las Cantidades Adeudadas UNIPRO.* Destacó que, independientemente del trámite de revisión de la *Sentencia Parcial* ante los foros apelativos, era un hecho cierto y estipulado que Abengoa cobró $160,869,125.55 del precio total de contrato.

En desacuerdo, el 6 de septiembre de 2022, Abengoa presentó su *Oposición de Abengoa a la "Segunda Solicitud para que se Ordene el Pago a UNIPRO".*[48] En síntesis, esgrimió que era imposible atender el tema con relación a la solicitud de pago de UNIPRO, toda vez que la jurisdicción de esta Curia había quedado suspendida provisionalmente durante el proceso apelativo de la *Sentencia Parcial.* En específico, expresó que, ante la presentación del recurso de Apelación, la efectividad de la *Sentencia Parcial* había quedado paralizada, al igual que todas las controversias relacionadas al *Informe.* Razonó, además, que el reclamo de UNIPRO era una cuestión ligada a una o varias de las controversias que se encontraban ante la consideración del foro apelativo. De igual forma, el 7 de septiembre de 2022, American International presentó su *Oposición de American International Insurance Company of Puerto Rico a la Segunda Moción de UNIPRO Architects and Engineers de Orden de Pago*[49] en la cual reiteró los argumentos de la Oposición de Abengoa.

Luego de examinar los argumentos de las partes, el 14 de septiembre de 2022, notificada el 15 de septiembre de 2022, el foro

---

[47] Apéndice del recurso KLCE202201145, a las págs. 582-586.
[48] *Id.,* a las págs. 587-592.
[49] *Id.,* a las págs. 593-598.

primario emitió una *Orden*[50] en la cual determinó abstenerse de intervenir hasta tanto este foro dispusiera del asunto.

Inconforme con el curso decisorio del foro primario, el 18 de agosto de 2022, se presentaron dos recursos de *Apelación.* El *primer* recurso de *Apelación,* identificado con el alfanumérico KLAN202200660 fue presentado por American International. Mediante el recurso presentado, American International esgrimió la comisión de tres (3) errores por el foro primario, a saber:

A. Erró el Tribunal de Primera Instancia al acoger el Informe del Comisionado Especial debido a que éste (i) se basa en comunicaciones precontractuales inadmisibles e insuficientes que fueron suplantadas por el propio Contrato, el cual según redactado por la AEE incluye una cláusula de "Çomplete Agreement"; e (ii) ignora y malinterpreta los términos expresos del Contrato, los cuales no imponen a Abengoa PR obligación alguna de mantener el Equipo principal del Proyecto ni su almacenamiento por un número indefinido de años a ningún costo adicional para la AEE.

B. Erró el Tribunal de Primera Instancia al acoger el Informe del Comisionado toda vez que el mismo determina que los retrasos de la AEE en obtener los Permisos constituyó *fuerza mayor,* ello, a pesar de que los hechos incontrovertidos demuestran que (i) la AEE nunca notificó a Abengoa PR de *tal fuerza mayor,* lo que era un requisito establecido por el Contrato para poder invocar esta defensa; y (ii) aún de la AEE haber declarado propiamente la *fuerza mayor,* Abengoa PR hubiese sido excusada también por cualquier incumplimiento de su parte bajo el Contrato, empero, la AEE repetidamente ordenó a Abengoa PR a proceder con trabajos extras y fuera de secuencia que la AEE tenía que compensar independientemente de que se hubiese declarado *fuerza mayor.*

C. Erró el Tribunal de Primera Instancia al acoger el Informe del Comisionado ya que éste se basó en un documento inexistente que no es parte de la prueba admitida, así como en lenguaje alterado que no aparece en los documentos que sí fueron admitidos; y porque se basó en la conclusión errónea de que la obtención de los Permisos por parte de la AEE era un evento "inminente", a pesar de que la AEE acabó obteniendo dichos Permisos cinco años más tarde de lo intencionado y por lo menos diecisiete meses luego de que Abengoa PR terminara el Contrato, todo lo que constituye manifiesto error que debió resultar en el rechazo del Informe.

---

[50] *Id.,* a las págs. 599-601.

Por su parte, en el *segundo* recurso de *Apelación*, identificado con el alfanumérico KLAN202200663 compareció Abengoa, alegando la comisión de nueve (9) errores por el foro primario, a saber:

**PRIMER ERROR:**

EL TPI AL ADOPTAR UN INFORME QUE INTENCIONALMENTE EVADE A CADA UNA DE LAS DISPOSICIONES ESPECÍFICAS DEL CONTRATO DE OBRA QUE FUERON ARGUMENTADAS EN LOS ESCRITOS POST-JUICIO Y QUE ATIENDEN Y RESUELVEN LAS CONTROVERSIAS DE AUTOS DE FORMA DIAMETRALMENTE OPUESTA A LA RECOMENDADA POR EL COMISIONADO.

**SEGUNDO ERROR:**

ERRÓ EL TPI AL ADOPTAR UN INFORME CUYAS DETERMINACIONES CENTRALES ESTÁN BASADAS EN PRUEBA FICTICIA O INADMITIDA QUE FUE INSERTADA POR EVIDENTE EQUIVOCACIÓN DEL COMISIONADO, LO CUAL INHABILITA EL INFORME.

**TERCER ERROR:**

ERRÓ EL TPI AL ADOPTAR LA DEFENSA DE *FUERZA MAYOR* PARA JUSTIFICAR LOS MÚLTIPLES INCUMPLIMIENTOS DE LA AEE, CUANDO TAL DEFENSA ESTÁ IMPOSIBILITADA COMO CUESTIÓN DE DERECHO POR SEIS RAZONES INDEPENDIENTES, CUALQUIERA DE LAS CUALES ES SUFICIENTE PARA DESCARTAR LA DEFENSA E INVALIDAR EL INFORME.

**CUARTO ERROR:**

ERRÓ EL TPI AL ADOPTAR UN INFORME CON VARIOS OTROS HALLAZGOS DEL COMISIONADO BASADOS EN SU ENTENDIMIENTO TOTALMENTE FALLIDO E IMPROVISADO DE CONCEPTOS DE LA INDUSTRIA CARENTES DE PRUEBA O EN LECTURAS ERRADAS DE DOCUMENTOS QUE TAMBIÉN IMPROVISO ÉL Y QUE INVALIDAN LAS CONCLUSIONES DEL INFORME.

**QUINTO ERROR:**

ERRÓ EL TPI AL ADOPTAR UN INFORME QUE PRETENDE ENMENDAR AL CONTRATO ESCRITO PARA CREAR UN ACUERDO ORAL INDEFINIDO DE "FRAGMENTACIÓN DE TAREAS" SIN CAUSA, A PERPETUIDAD, Y SIN QUE EL INFORME ALUDIERA A UN SOLO HECHO LEGALMENTE PERMISIBLE PROBADO EN EL JUICIO QUE SIRVA DE BASE PARA TAL IMPROVISADA ENMIENDA. ELLO DE POR SÍ REQUIERE REVOCACIÓN DE LA SENTENCIA PARCIAL.

**SEXTO ERROR:**

ERRÓ EL TPI AL ADOPTAR UN INFORME QUE INTENCIONALMENTE HACE CASO OMISO A LA DOCTRINA NORMATIVA DE *LEVY V AUTORIDAD DE EDIFICIOS PÚBLICOS,* 135 D.P.R. 382 (1994) QUE REQUIERE QUE EL DUEÑO DE OBRA PAGUE AL CONTRATISTA EXTRA-COSTES RELACIONADOS CON UN RETRASO EN LA OBRA MÁS ALLÁ DE LO RAZONABLEMENTE PREVISIBLE POR ASUNTOS BAJO LA RESPONSABILIDAD O NECESIDAD DEL DUEÑO, Y QUE RECONOCE QUE CUANDO SE REPUDIA TAL OBLIGACIÓN RADICALMENTE EL CONTRATO PUEDE SER TERMINADO.

**SÉPTIMO ERROR:**

ERRÓ EL TPI AL ADOPTAR UN INFORME QUE ADMITE QUE LA AEE ORDENÓ PREMATURAMENTE AL CONTRATISTA LA FABRICACIÓN DE COSTOSO EQUIPO SIN QUE LA AEE TUVIERA INFORMACIÓN DE QUE SE EMITIRÍAN OPORTUNAMENTE SUS PERMISOS PARA INSTALARLO, LUEGO ORDENÓ QUE EL CONTRATISTA ENTREGARA EL EQUIPO A LA POSESIÓN Y FACILIDADES DE LA AEE A LA INTEMPERIE Y EXPUESTAS AL SALITRE, Y FINALMENTE PRETENDIÓ ILEGALMENTE QUE EL DETERIORO DEL EQUIPO Y SU COSTOSA REPARACIÓN QUE EMANARON DE TALES ÓRDENES DE LA AEE LO SUBSIDIARA EL CONTRATISTA, EN VIOLACIÓN NO SÓLO DEL CONTRATO SINO ADEMÁS DE LAS DOCTRINAS DE *ZEQUEIRA V. CORPORACIÓN DE RENOVACIÓN URBANA Y VIVIENDA,* 83 D.P.R. 878 *(1961) Y DANOSA CARIBBEAN* V. *SANTIAGO METAL,* 179 D.P.R. 40 (2010) QUE REQUIEREN PAGO POR EL DUEÑO POR TAREAS FUERA DEL ÁMBITO DE LAS ESPECIFICACIONES DE LA SUBASTA.

**OCTAVO ERROR:**

ERRÓ EL TPI AL ADOPTAR UN INFORME QUE VIOLA EL MANDATO DE LA REGLA 42.2 DE PROCEDIMIENTO CIVIL, REITERADO POR EL TRIBUNAL SUPREMO EN *PÉREZ VARGAS V OFFICE DEPOT,* 203 D.P.R. 687 (2019), *ANDINO V. TOPEKA, INC.,* 142 D.P.R. 933 (1997), Y *TORRES V. DÁVILA,* 140 D.P.R. 83 (1996) QUE REQUIERE QUE SE DICTAMINEN Y ENUMEREN LOS HECHOS QUE RESULTAN PROBADOS DE LA EVIDENCIA, Y SE DIRIMA EN BASE A DICHOS HECHOS ENUMERADOS TODO CONFLICTO QUE HAYA EXISTIDO EN LA PRUEBA DE LAS PARTES SOBRE CONTROVERSIAS MATERIALES.

**NOVENO ERROR:**

COMO ALTERNATIVA, ERRÓ EL TPI AL CLAUDICAR A LA FUNCIÓN JUDICIAL REVISORA REQUERIDA POR LAS REGLAS DE LITIGIO COMPLEJO, Y ESTE TRIBUNAL DEBE DIRIGIR AL JUEZ O JUEZA ADMINISTRADORA DEL TRIBUNAL DE INSTANCIA A

QUE PROVEA LOS RECURSOS NECESARIOS AL TRIBUNAL SUPERIOR PARA QUE ÉSTE PUEDA EJERCER TAL FUNCIÓN REVISORA EN BASE A LOS HECHOS MATERIALES ESTIPULADOS Y A LAS ADMISIONES DE PARTE, PARA EMITIR SENTENCIA A FAVOR DE LA APELANTE.

Por último, y según expresamos, el *tercer* recurso se presentó por UNIPRO, mediante una petición de *Certiorari* identificado por el alfanumérico KLCE202201145 con relación a una *Orden*[51] emitida el 14 de septiembre de 2022, notificada el 15 de septiembre de 2022. En el recurso de *Certiorari*, UNIPRO esgrimió la comisión de errores por el foro primario, a saber:

Primero: ERRÓ el Tribunal de Primera Instancia al abstenerse de intervenir hasta tanto este Honorable Tribunal disponga del asunto planteado ante sí[.]

Segundo: ERRÓ, el Tribunal de Primera Instancia al no dictar sentencia y no emitir una orden de pago a favor de UNIPRO por las cantidades adeudadas por los trabajos realizados por UNIPRO en el Proyecto, TSMP-201-004-94 para la Repotenciación de la Unidades 5 y 6 de la Central Termoeléctrica de San Juan.

Mediante *Resolución* emitida el 13 de diciembre de 2022, este Tribunal ordenó la consolidación del recurso KLAN202200660 con el KLAN202200663. Luego, tras la presentación del recurso KLCE202201145, este Tribunal dispuso unir el mismo a los recursos ya consolidados.

El 21 de septiembre de 2022, la AEE compareció mediante la presentación de dos (2) escritos. El *primero* fue el intitulado *Alegato en Oposición al Recurso de Apelación de AIG*. Entiéndase, la AEE presentó su alegato en oposición al alfanumérico KLAN202200660. Por otro lado, el *segundo* escrito fue intitulado *Alegato en Oposición al Recurso de Apelación de Abengoa*. Entiéndase, la AEE presentó su alegato en oposición al alfanumérico KLCE202300663.

Con relación al recurso de *Certiorari* KLCE202201145 se presentaron dos (2) escritos ante esta Curia, ambos, el 24 de octubre

---

[51] *Id.,* a las págs. 599-601.

de 2022. El *primero* fue presentado por AIG mediante el escrito intitulado *Memorando en Oposición a que se Expida el Auto de Certiorari*. El *segundo* fue presentado por Abengoa mediante el escrito *Memorando de Abengoa en Oposición a que se Emita Certiorari*.

Luego de varios incidentes procesales ante esta Curia, revisados los autos y contando con el beneficio de la comparecencia de las partes en los recursos de revisión, procedemos a disponer de los mismos.

II

**A. Recurso de Apelación**

La Regla 52.2(a) de Procedimiento Civil[52], dispone que los recursos de apelación tienen que presentarse dentro de un término jurisdiccional de treinta (30) días desde el archivo en autos de copia de la notificación de la sentencia recurrida. Como es conocido, un plazo jurisdiccional es de carácter fatal. Ello quiere decir que no admite justa causa, es improrrogable, y que su incumplimiento es insubsanable.[53] La correcta notificación de una sentencia es una característica imprescindible del debido proceso judicial.[54] Como corolario de lo anterior, la Regla 13(A) del Reglamento de este Tribunal establece que:

> Las apelaciones contra sentencias dictadas en casos civiles por el Tribunal de Primera Instancia, se presentarán dentro del término jurisdiccional de treinta días contados desde el archivo en autos de una copia de la notificación de la sentencia.[55]

No obstante, el término de treinta (30) días para acudir en alzada puede quedar interrumpido mediante la presentación oportuna de una moción de reconsideración fundamentada.[56] En tal

---

[52] 32 LPRA Ap. V, R. 52.2 (a).
[53] *Martínez, Inc. v. Abijoe Realty Corp.*, 151 DPR 1, 7 (2000). *Arriaga v. FSE*, 145 DPR 122, 131 (1998). *Loperena Irizarry v. ELA*, 106 DPR 357, 360 (1977).
[54] *Rodríguez Mora v. García Lloréns*, 147 DPR 305, 309 (1998).
[55] 4 LPRA Ap. XXII-B, R. 13 (A).
[56] 32 LPRA Ap. V, R. 47.

caso, el curso del término para apelar comienza a partir del archivo en autos copia de la notificación de la resolución que resuelve la moción.[57] Esto, a pesar de que se haya declarado la moción No Ha Lugar.

### B. Expedición del recurso de *Certiorari*

Los recursos de *Certiorari* presentados ante el Tribunal de Apelaciones deben ser examinados en principio bajo la Regla 52.1 de Procedimiento Civil.[58] Esta Regla limita la autoridad y el alcance de la facultad revisora de este Tribunal mediante el recurso de *Certiorari* sobre órdenes y resoluciones dictadas por los Tribunales de Primera Instancia. La Regla lee como sigue:

> […]
> El recurso de Certiorari para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, **en casos de relaciones de familia**, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de Certiorari en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión.[59] (Énfasis suplido).
> […]

Por su parte, la Regla 52.2(b) dispone sobre los términos y efectos de la presentación de un recurso de *Certiorari* que:

> […]
> (b) *Recurso de "certiorari"* […]
> Los recursos de *certiorari* al Tribunal de Apelaciones para revisar resoluciones u órdenes del Tribunal de Primera Instancia o al Tribunal Supremo para revisar las demás sentencias o resoluciones finales del Tribunal de Apelaciones en recursos discrecionales o para revisar cualquier resolución interlocutoria del Tribunal de Apelaciones deberán presentarse dentro del término de

---

[57] *Id.*
[58] 32 LPRA Ap. V, R. 52.1.
[59] *Id.*

> treinta (30) días contados desde la fecha de notificación de la resolución u orden recurrida. El término aquí dispuesto es de cumplimiento estricto, prorrogable sólo cuando medien circunstancias especiales debidamente sustentadas en la solicitud de *certiorari*.[60]
> [...]

El recurso de *Certiorari* es un vehículo procesal que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior.[61] Expedir el recurso "no procede cuando existe otro recurso legal que protege rápida y eficazmente los derechos de la parte peticionaria".[62] Conviene desatacar que la discreción ha sido definida como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera".[63] A esos efectos, se ha considerado que "la discreción se nutre de un juicio racional apoyado en la razonabilidad y en un sentido llano de justicia y no es función al antojo o voluntad de uno, sin tasa ni limitación alguna".[64] La Regla 40 del Reglamento del Tribunal de Apelaciones[65], esboza los criterios que el Tribunal deberá considerar para expedir un auto de *Certiorari*, como sigue:

A. Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
B. Si la situación de hechos planteada es la más indicada para el análisis del problema.
C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
F. Si la expedición el auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

---

[60] 32 LPRA Ap. V, R. 52.2(b).
[61] *800 Ponce de León, Corp. v. American International Insurance Company of Puerto Rico*, 205 DPR 163, 174 (2020).
[62] *Id.*
[63] *Mun. de Caguas v. JRO Construction*, 201 DPR 703, 712 (2019). *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013).
[64] *Id.*
[65] 4 LPRA Ap. XXII-B, R. 40.

El Tribunal Supremo de Puerto Rico (en adelante, Tribunal Supremo) ha establecido que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto.[66] Quiérase decir, no hemos de interferir con los Tribunales de Primera Instancia en el ejercicio de sus facultades discrecionales, excepto en aquellas situaciones en que se demuestre que este último: (i) actuó con prejuicio o parcialidad, (ii) incurrió en un craso abuso de discreción, o (iii) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo.[67]

### C. Teoría general de los contratos

Bajo nuestro crisol doctrinario, "[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia".[68] Dichas obligaciones contractuales tienen fuerza de ley entre las partes y deben cumplirse según lo pactado.[69] En nuestro ordenamiento jurídico, rige el principio de libertad de contratación.[70] Las partes contratantes, bajo el principio de autonomía contractual, pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a la ley, a la moral, ni al orden público.[71] Por lo tanto, una vez perfeccionado un contrato con el mero consentimiento, las partes que lo suscriben están sujetas, a hacer valer el cumplimiento de lo pactado, y a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley.[72] Para que se

---

[66] *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 DPR 203, 208 (1994).
[67] *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000).
[68] 31 LPRA sec. 2992, Art. 1042.
[69] 31 LPRA sec. 2994, Art. 1044.
[70] *Oriental Finance v. Nieves*, 172 DPR 462, 470 (2007).
[71] 31 LPRA sec. 3372, Art. 1207. *Oriental Finance v. Nieves, Id.*, 470-471. *Vélez v. Izquierdo*, 162 DPR 88, 98 (2004).
[72] 31 LPRA sec. 3375, Art. 1210. *Banco Popular de P.R. v. Sucn. Talavera*, 174 DPR 686, 693 (2008).

considere que existe un contrato se requiere que concurran tres requisitos: (i) consentimiento de los contratantes, (ii) un objeto cierto que sea materia del contrato, y (iii) la causa de la obligación que se establezca.[73] En el caso de los contratos de seguros, el asegurador y el asegurado, se obligan a cumplir con los términos y condiciones de la póliza.[74] Es menester destacar, que la regla en cuanto a la interpretación contractual es que, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes o ambigüedades, se estará al sentido literal de sus cláusulas.[75]

La intención de las partes será el criterio fundamental para fijar el alcance de las obligaciones contractuales.[76] A raíz de ello, al momento de analizar la intención de los contratantes, los tribunales deben atender, no solo los actos anteriores, coetáneos y posteriores al contrato, sino también las circunstancias indicativas de la voluntad de las partes.[77] A tales efectos, al examinar la intención contractual, resulta importante considerar quiénes son las partes, sus experiencias particulares y conocimientos especializados sobre la materia sobre la cual versa el contrato.[78] Las cláusulas de un contrato deben interpretarse de forma integrada en relación de unas cláusulas con las otras, y no aisladamente, buscando siempre su verdadero sentido.[79] La interpretación final debe ser cónsona con el principio de la buena fe y no llevar a resultados incorrectos, absurdos e injustos para las partes.[80]

---

[73] 31 LPRA sec. 3391, Art. 1213.
[74] *Quiñones López v. Manzano Pozas*, 141 DPR 139, 154 (1996).
[75] 31 LPRA sec. 3471, Art. 1233. *CFSE v. Unión de Médicos de la CFSE*, 170 DPR 443, 450 (2007). *Rivera v. Rivera*, 168 DPR 193, 212 (2006). *Trinidad v. Chade*, 153 DPR 280, 289 (2001).
[76] *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 DPR 64, 69 (1983).
[77] 31 LPRA sec. 3472, Art. 1234. *Marina Ind., Inc. v. Brown Boveri Corp., Id. Blas v. Hospital Guadalupe*, 167 DPR 439, 451 (2006).
[78] *Unysis v. Ramallo Brothers*, 128 DPR 842, 853 (1991).
[79] *Guadalupe Solis v. González Durieux*, 172 DPR 676, 685 (2007).
[80] *Id.*, 684-685.

### D. Contrato de arrendamiento de obras y servicios

El contrato de arrendamiento de obras y servicios está regulado por el Artículo 1434 del Código Civil de Puerto Rico.[81] A través de dicho contrato, una de las partes se obliga a ejecutar una obra, o a prestar a la otra un servicio por precio cierto.[82] El Tribunal Supremo de Puerto Rico ha definido el contrato de arrendamiento de obras como esencialmente uno de trabajo, mediante el cual una de las partes se encarga de hacer una cosa para la otra, mediante un precio convenido entre ellos.[83] A este tipo de contrato también se le conoce como contrato de empresa, contrato de obra, llamado de arrendamiento o contrato de ejecución de obras.[84] Ahora bien, no hay duda que el contrato de obra es uno de carácter consensual, bilateral y oneroso, cuyos elementos son la obra a realizarse y el precio.[85] El Tribunal Supremo ha expresado que "[e]l incumplimiento total o parcial de las prestaciones a las que se han obligado las partes sujetará las mismas a las sanciones que a esos efectos provee el Código Civil".[86] Así pues, cuando una de las partes incumpla de total o parcialmente con lo pactado, tal incumplimiento estará sujeto a las sanciones dispuestas por el Código Civil.

### E. Caso Fortuito o Fuerza Mayor

El Art. 1058 del Código Civil de 1930, dispone que, fuera de los casos expresamente mencionados en la ley, y de los en que así lo declare la obligación, nadie responderá de aquellos sucesos que no hubieran podido preverse, o que, previstos, fueran inevitables.[87] Por tanto, si el daño es previsible por éste, hay responsabilidad. Si

---

[81] 31 LPRA sec. 4013, Art. 1434.
[82] *Id.*
[83] *Master Concrete Corp. v. Fraya, S.E.*, 152 DPR 616, 623-624 (2000).
[84] *Id.,* citando a Ignacio Rubio San Román, *La Responsabilidad Civil en la Construcción*, Ed. Colex, 1987, pág. 55.
[85] *Id.*, 624. *Constructora Bauzá, Inc. v. García López*, 129 D.P.R. 579, 592 (1991).
[86] *Id.*, *Master Concrete Corp. v. Fraya, S.E.*, 152 DPR 616, 623-624 (2000).
[87] 31 LPRA sec. 3022, Art. 1058.

no es previsible, estamos generalmente en presencia de un caso fortuito.[88]

En virtud de lo anterior, el incumplimiento imposible se produce cuando examinadas las circunstancias en que se firma un contrato y las circunstancias en que debe cumplirse posteriormente, resulta que su cumplimiento posterior no es posible, por la sobreviniencia de ciertos hechos que no existían al momento de contraerse la obligación.[89] Ahora bien, para que el cumplimiento imposible pueda producirse y la parte quede eximida de responsabilidad civil, el tribunal debe quedar convencido de lo siguiente: (1) que el obligado esté exento de culpa en el cumplimiento; (2) que una serie de circunstancias, ajenas a la voluntad del obligado, han sobrevenido para hacer el cumplimiento imposible; (3) que las cosas objeto del contrato no puedan ser restituidas en especie a la parte que sufragó su precio dentro de un tiempo razonable; y (4) que el obligado no haya asumido directamente el riesgo de cualesquiera nuevas circunstancias que puedan impedir el incumplimiento.[90] Finalmente, el efecto jurídico de la imposibilidad en el cumplimiento, si sobreviene después de firmado y ejecutado parcialmente el contrato, es que las partes quedarán relevadas de todo cumplimiento posterior, y quedarán obligadas mutuamente a restituirse el valor de las prestaciones que hasta la fecha de la imposibilidad hubieren recibido.[91]

### F. Apreciación de la Prueba, Deferencia Judicial y Discreción Judicial

Como es sabido, el ejercicio discrecional de la apreciación de la prueba que ejerce el TPI y las determinaciones que realiza están

---

[88] *Arnold Valle Izquierdo v. E.L.A.*,157 DPR 1 (2002).
[89] *Rodríguez López v. Municipio*, 75 DP 479, 490 (1953).
[90] *Id.,* en la pág. 493.
[91] *Id.*

revestidas de confiabilidad y merecen respeto y deferencia.[92] Por ello, la valoración que lleva a cabo el foro primario se presume correcta, toda vez que es este quien tiene la oportunidad de ver, escuchar y valorar las declaraciones de los testigos, así como sus lenguajes no verbales.[93] Por su parte, un foro apelativo cuenta solamente con "récords mudos e inexpresivos", por lo que se le debe respeto a la adjudicación de credibilidad realizada por el juzgador primario de los hechos.[94] En ese sentido, y como regla general, no debemos intervenir con las determinaciones que este haya efectuado en virtud de la presunción de corrección de la que gozan.[95]

En vista de lo anterior, nuestro máximo foro ha resuelto que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto, o cuando un análisis integral de la prueba así lo justifique.[96] El Alto Foro ha determinado que un juzgador incurre en pasión, prejuicio o parcialidad si actúa movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna.[97] En consecuencia, al este tribunal apelativo enfrentarse a la tarea de revisar las determinaciones del foro de instancia, no debe intervenir con las determinaciones de hechos, con la apreciación de la prueba ni con

---

[92] *Pueblo v. Pérez Núñez*, 208 DPR 511, 514 (2022). *Argüello v. Argüello*, 155 DPR 62, 79 (2001) citando a *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). *Trinidad v. Chade*, 153 DPR 280, 289 (2001).

[93] *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021). *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 142 (2013). *Pueblo v. Santiago*, 176 DPR 133, 148 (2009). *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

[94] *Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 177 DPR 345, 356 (2009). *Trinidad v. Chade, supra,* 291.

[95] *Pueblo v. Pérez Núñez, supra*, 529.

[96] *Pueblo v. Calderón Álvarez*, 140 DPR 627, 644 (1996). *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 DPR 203, 208 (1994). *Rivera Pérez v. Cruz Corchado*, 119 DPR 8, 14 (1987). S*ierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).

[97] *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 782 (2013).

la adjudicación de credibilidad efectuadas por el mismo, excepto en aquellas situaciones en que se demuestre que este último: (i) actuó con prejuicio o parcialidad, (ii) incurrió en un craso abuso de discreción, o (iii) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo.[98]

Con relación al error manifiesto, un juzgador incurre en este cuando de un análisis de la totalidad de la evidencia, este Tribunal queda convencido de que las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida.[99] Por tanto, debe existir base suficiente en la prueba admitida que apoye la determinación del foro.[100]

De igual forma, se podrá intervenir con la determinación del TPI cuando la referida valoración se aparte de la realidad fáctica o resulte inherentemente imposible o increíble; de lo contrario, el tribunal apelativo deberá abstenerse de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos.[101]

Ahora bien, cabe destacar que el Tribunal Supremo ha resuelto que, en instancias en que las conclusiones de hecho que realice el TPI estén basadas en prueba pericial o documental, un tribunal revisor estará en la misma posición que el tribunal *a quo*.[102] Por tanto, ante dichas instancias, este tribunal apelativo "tendrá la facultad para adoptar su propio criterio en la apreciación y

---

[98] *González Hernández v. González Hernández*, 181 DPR 746, 776 (2011). *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009). *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000). *Pueblo v. Irizarry*, 156 DPR 780, 789 (2002). *Pueblo v. Maisonave*, 129 DPR 49, 62-63 (1991).
[99] *Dávila Nieves v. Meléndez Marín, supra,* 772.
[100] *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018). *Pueblo v. Irizarry, supra.*
[101] *Santiago Ortiz v. Real Legacy et al., supra. Pueblo v. Arlequín Vélez,* 204 DPR 117, 148 (2020). *Pueblo v. Martínez Landrón*, 202 DPR 409, 424 (2019) citando a *Pueblo v. Maisonave, supra,* 63. *González Hernández v. González Hernández, supra,* 777. *Pueblo v. Viruet Camacho*, 173 DPR 563, 584 (2009). *Pueblo v. Irizarry, supra. Pueblo v. Acevedo Estrada, supra.*
[102] *González Hernández v. González* Hernández.

evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta".[103]

A esos efectos, aunque no está exenta de la posibilidad de toda revisión, si la actuación del tribunal a *quo* no está desprovista de base razonable ni perjudica los derechos sustanciales de una parte, lo lógico es que prevalezca el criterio del TPI a quien corresponde la dirección del proceso.[104] Los foros apelativos podremos intervenir con tal apreciación luego de realizar una evaluación rigurosa y que, de esta, surjan serias dudas, razonables y fundadas.[105]

Las decisiones discrecionales que toma el TPI no serán revocadas a menos que se demuestre que ese foro abusó de su discreción.[106] Un tribunal de justicia incurre en un abuso de discreción: (i) cuando el juez no toma en cuenta e ignora en la decisión que emite, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; (ii) cuando el juez, por el contrario, sin justificación ni fundamento alguno, concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en éste; o, (iii) cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez los sopesa y calibra livianamente.[107]

A su vez, es una norma bien establecida de nuestro sistema de justicia que la discreción judicial permea la evaluación de la evidencia presentada en los casos y controversias.[108] No obstante, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal revisor.[109] A

---

[103] *González Hernández v. González* Hernández*, Id. Mun. de Loíza v. Sucns. Suárez et al.*, 154 DPR 333, 363 (2001). *Prieto v. Mary land Casualty Co.*, 98 DPR 594, 623 (1970).

[104] S*ierra v. Tribunal Superior, supra.*

[105] *Pueblo v. Pérez Núñez, supra.*

[106] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434 (2013). *Pueblo v. Rivera Santiago, 176 DPR 559, 580 (2009).*

[107] *Pueblo v. Rivera Santiago, supra.*

[108] *González Hernández v. González Hernández, supra,* 776.

[109] *Rivera Pérez v. Cruz Corchado, supra.*

esos efectos, conviene destacar que, la intervención del foro apelativo con la prueba desfilada tiene que estar basada en un análisis independiente y no a base de los hechos que exponen las partes.[110]

### G. Regla 42.2 de las de Procedimiento Civil

Como regla general, nuestro ordenamiento jurídico requiere que las sentencias dictadas por los tribunales cumplan con ciertas exigencias de forma.[111] Cónsono con lo anterior, la Regla 42.2 de las de Procedimiento Civil, dispone lo siguiente:

> En todos los pleitos, el tribunal especificará los hechos probados, consignará separadamente sus conclusiones de derecho y ordenará que se registre la sentencia que corresponda. Al conceder o denegar *injunction* interlocutorios, el tribunal, de igual modo, consignará las determinaciones de hechos y conclusiones de derecho que constituyan los fundamentos de su resolución. Las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos. **Las determinaciones de hechos de un comisionado especial, en tanto y en cuanto el tribunal las adopte, se considerarán como determinaciones de hechos del tribunal.**

> No será necesario especificar los hechos probados y consignar separadamente las conclusiones de derecho:
> (a) al resolver mociones bajo las Reglas 10 ó 36.1 y 36.2, o al resolver cualquier otra moción, excepto lo dispuesto en la Regla 39.2;
> (b) en casos de rebeldía;
> (c) cuando las partes así lo estipulen, o
> (d) cuando el tribunal así lo estime por la naturaleza de la causa de acción o el remedio concedido en la sentencia.

> En los casos en que se deniegue total o parcialmente una moción de sentencia sumaria, el tribunal determinará los hechos en conformidad con la Regla 36.4.[112]

Al evaluar los requisitos de forma establecidos en la aludida Regla 42.2 de Procedimiento Civil, *supra,* el tratadista Rafael Hernández Colón sostiene que las determinaciones de hechos probados que de ordinario se consignan en una sentencia "no son

---

[110] *Hernández v. San Lorenzo Const.,* 153 DPR 405, 425 (2001).
[111] *Pérez Vargas v. Office Depot,* 203 DPR 687, 700 (2019).
[112] 32 LPRA Ap. V, R. 42.2.

más que el resultado del proceso adjudicativo al que se adentra un tribunal luego de celebrado el juicio en su fondo".[113] Este proceso, a su vez, consiste en "dirimir los conflictos que pueda haber, determinar la credibilidad de los testigos, determinar qué documentos se tendrán por auténticos, y determinar qué hechos se tendrán por probados".[114] Hernández Colón, *op cit.,* pág. 375. En lo pertinente, Cuevas Segarra explica que: "Los hechos probados son los que se relacionan en la sentencia, ya que ésta no puede ser una recapitulación de la prueba presentada o un informe de todo lo acontecido en el juicio". La regla no requiere detalles innecesarios y minuciosos".[115] De igual forma, el Tratadista expresa que: "el dejar de exponer por separado un hecho probado como una conclusión del tribunal, no es una omisión que motive la revocación de la sentencia dictada en el caso. Esto es así porque ningún tribunal viene obligado a indicar todos los posibles fundamentos en apoyo de una sentencia; y dentro de su sentencia, si ha expresado lo que estima suficientes para su determinación".[116]

### H. Regla 41 y 41.5 de las de Procedimiento Civil

La regla 41.1 de las de Procedimiento Civil dispone que el tribunal en el que esté pendiente un pleito o procedimiento podrá nombrar un comisionado o una comisionada especial en relación con dicho pleito o procedimiento.[117] Es decir, dicha regla regula todo lo relacionado a un Comisionado Especial. Asimismo, dicha regla permite que el Tribunal encomiende a un Comisionado Especial un asunto, cuando están involucradas cuestiones sobre cuentas y cómputos difíciles de daños o casos que involucren cuestiones

---

[113] *Pérez Vargas v. Office Depot,* a la pág. 375, citando a R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil,* 5ta ed., San Juan, Ed. Lexis Nexis, 2010.

[114] Hernández Colón, *op cit.,* a la pág. 375.

[115] J. A. Cuevas Segarra, *Tratado de Derecho Procesal Civil,* 2da ed., Publicaciones JTS 2011, T. IV, página: 1229.

[116] J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil,* 2da ed., Publicaciones JTS 2011, T. IV, página: 1230.

[117] 32 LPRA Ap. V, R. 41.1.

sumamente técnicas o de un conocimiento especial altamente especializado.[118] Así pues, el Comisionado es considerado como un funcionario designado por el Tribunal, en quien se delega determinados poderes para que formule ciertas determinaciones o conclusiones en un procedimiento activo.[119] El propósito en la designación de un comisionado especial consiste en facilitar la labor judicial.[120] Por tanto, la designación de un comisionado es para asistir al juzgador, no para reemplazarlo.[121]

De igual forma, la Regla 41.2 de las de Procedimiento Civil establece que:

> no se encomendará el caso a un comisionado o una comisionada en ningún pleito, salvo cuando estén involucradas cuestiones sobre cuentas y cómputos difíciles de daños o casos que involucren cuestiones sumamente técnicas o de un conocimiento pericial altamente especializado. No se nombrará un comisionado especial si una parte demuestra que el nombramiento ocasionaría una dilación innecesaria en los procedimientos o unos costos irrazonables.[122]

Entre los poderes que tendrá el Comisionado, la Regla 41.3 expresa que:

> La orden para encomendar un asunto a un comisionado o comisionada especificará con particularidad sus poderes y requerirá que informe sobre determinadas cuestiones litigiosas solamente, que haga determinados actos o que solamente reciba prueba y transmita el expediente de ésta, y fijará un término razonable dentro del cual el comisionado o la comisionada deberá presentar su informe. Sujeto a las especificaciones y limitaciones establecidas en la orden, el comisionado o la comisionada tendrá y ejercitará el poder de regular los procedimientos en toda vista celebrada ante él o ella, y de realizar cualquier acto y tomar cualquier medida que sea necesaria o adecuada para el cumplimiento eficiente de sus deberes bajo la orden. [...] Podrá exigir que se produzca ante él o ella cualquier prueba sobre todos los asuntos comprendidos en la encomienda, incluso la producción de todos los libros, papeles, comprobantes, documentos y escritos pertinentes. Podrá decidir sobre la admisibilidad de prueba, a menos que se disponga otra cosa en la orden

---

[118] *Mayagüez Hilton Corp. V. Betancourt,* 156 DPR 234, 258 (2002).
[119] R. Hernández Colón, <u>Práctica Jurídica de Puerto Rico, Derecho Procesal Civil</u>, 5ta ed. revisada, LexisNexis de Puerto Rico, 2010, sec. 3701, pág. 356.
[120] *Id.*, sec. 3702, pág. 357.
[121] J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2da ed., Publicaciones JTS 2011, T. III, pág. 1199.
[122] 32 LPRA Ap. V, R. 41.2.

de encomienda, tendrá la facultad de juramentar personas testigos y examinarlas, de citar las partes en el pleito y de examinarlas bajo juramento. [123]

Una vez se le asigne el caso al Comisionado, este notificará a las partes o a sus abogados la fecha para la primera reunión. Si una parte deja de comparecer en la fecha y el lugar designados, el comisionado o la comisionada podrá proceder, en su ausencia o a su discreción, posponer los procedimientos para otro día, notificándolo a la parte ausente. En dicho proceso, las partes podrán obtener la comparecencia de personas testigos ante el comisionado o la comisionada mediante la expedición y notificación de citaciones conforme se dispone en la Regla 40.[124]

Luego de llevar a cabo el proceso, el Comisionado o Comisionada rendirá un Informe de la siguiente forma:

(a) *Contenido y presentación.* El comisionado o la comisionada preparará un informe sobre todos los asuntos encomendados por la orden del tribunal, **y si se le exige que haga determinaciones de hechos y conclusiones de derecho**, las expondrá en el informe, el cual presentará en la Secretaría del tribunal en la fecha señalada en la orden según lo dispuesto en la Regla 41.3. A menos que de otro modo se disponga, acompañará una relación de los procedimientos, un resumen de la prueba y los *exhibit* originales.

(b) *Proyecto del informe.* Antes de presentar su informe, el comisionado o la comisionada podrá someter un proyecto de éste a los abogados o las abogadas de todas las partes con el fin de recibir sus sugerencias. Al presentar el informe, el Secretario o la Secretaria lo notificará inmediatamente a todas las partes.

(c) *Aprobación al informe.* **En todos los casos, el tribunal aceptará las determinaciones de hechos del comisionado o de la comisionada, a menos que sean claramente erróneas.** Dentro de los veinte (20) días siguientes a la notificación del informe o del término que disponga el tribunal, cualquiera de las partes podrá notificar a las otras sus objeciones por escrito a dicho informe. La solicitud al tribunal para que tome la acción que proceda con respecto al informe y a las objeciones a éste se hará mediante moción y con notificación, según se dispone en la Regla 67. **El tribunal, después de oír a las partes, podrá adoptar el informe, modificarlo o rechazarlo en todo o en parte, recibir evidencia adicional o devolverlo con instrucciones.**[125] (énfasis nuestro).

---

[123] 32 LPRA Ap. V, R. 41.3.
[124] 32 LPRA Ap. V, R. 41.4.
[125] 32 LPRA Ap. V, R. 41.5.

(d) *Estipulación en cuanto a las determinaciones de hechos*. El efecto del informe del comisionado o de la comisionada será el mismo, hayan o no consentido las partes a que el asunto sea encomendado a un comisionado o una comisionada, pero cuando las partes estipulen que las determinaciones de hechos del comisionado o la comisionada sean finales, solamente se considerarán en lo sucesivo las cuestiones de derecho que surjan del Informe.

III

**KLAN202200660 y KLAN202200663**

En los recursos ante nuestra consideración, tanto Abengoa como American International nos solicitan la revocación de la *Sentencia Parcial* que emitió el foro primario el 18 de julio de 2022, notificada al día siguiente por el foro primario. Mediante el referido dictamen, el TPI acogió el *Informe del Comisionado Especial* (en adelante *Informe*), en consecuencia, dictó *Sentencia Parcial* a favor de la AEE por incumplimiento de contrato, desestimó la *Demanda* que presentó Abengoa y declaró Ha Lugar la Reconvención presentada por la AEE. Ordenó, además, la continuación de los procedimientos.

*-a-*

Por encontrarse estrechamente relacionados entre sí, discutiremos en conjunto los errores *A* y *C* del recurso de *Apelación* identificado con el alfanumérico KLAN202200660 y el *primer, segundo, cuarto* y *quinto* error del recurso de *Apelación* identificado con el alfanumérico KLAN202200663. En síntesis, en el alfanumérico KLAN202200660, American International plantea que erró el foro primario al acoger el *Informe*, aduciendo que se basó en comunicaciones precontractuales inadmisibles e insuficientes que fueron suplantadas por el contrato, las cuales ignoran y malinterpretan los términos de dicho Contrato. Asimismo, arguye que los términos del contrato no imponen a Abengoa la obligación de mantener el equipo principal del Proyecto ni su almacenamiento por un tiempo indefinido a ningún costo adicional para la AEE. A su

vez, alega que incidió el foro primario, debido a que acogió el *Informe*, el cual, alegadamente, estuvo basado en documentación inexistente que no era parte de la prueba admitida, así como en lenguaje alterado que no constaba en la prueba admitida. Asimismo, señaló que el foro primario debió rechazar dicho *Informe*, ya que determinó que la obtención de los permisos por parte de la AEE era un evento "inminente", a pesar de que la AEE acabó obteniendo dichos permisos cinco (5) años más tarde de lo previsto.

Por otra parte, en el alfanumérico KLAN202200663, Abengoa nos argumenta que el foro primario erró al adoptar el *Informe* alegando que intencionalmente evade las disposiciones del Contrato que fueron argumentadas en los escritos post-juicio. Esbozó, además, que, cometió error el foro primario al adoptar dicho *Informe*, aun cuando las determinaciones estaban basadas en prueba inadmitida, lo cual inhabilita el *Informe*. De igual forma, reiteró que incidió el foro primario al acoger el *Informe* basado en conclusiones fallidas e improvisadas, carentes de prueba o en lecturas erradas de documentos que invalidan las conclusiones del informe. Por último, señaló que el foro primario erró al adoptar el *Informe*, el cual pretendía enmendar el Contrato escrito para crear un acuerdo oral indefinido de "fragmentación de tareas" sin causa, a perpetuidad, y sin que el *Informe* aludiera a hechos legalmente permisibles y probados en el juicio que sirvieran de base para dichas enmiendas.

Como es sabido, el ejercicio discrecional de la apreciación de la prueba que ejerce el TPI y las determinaciones que realiza están revestidas de confiabilidad y merecen respeto y deferencia.[126] Por su parte, un foro apelativo cuenta solamente con "récords mudos e inexpresivos", por lo que se le debe respeto a la adjudicación de

---

[126] *Pueblo v. Pérez Nuñez*, 208 DPR 511, 514 (2022). *Argüello v. Argüello*, 155 DPR 62, 79 (2001) citando a *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). *Trinidad v. Chade*, 153 DPR 280, 289 (2001).

credibilidad realizada por el juzgador primario de los hechos.[127] En vista de lo anterior, nuestro máximo foro ha resuelto que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto, o cuando un análisis integral de la prueba así lo justifique.[128] Por otra parte, el Tribunal Supremo enfatiza que, solamente hemos alterado esos dictámenes en casos de error manifiesto en el desempeño de dicha función, cuando un examen detenido de toda la prueba nos convence que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio únicamente en testimonios de escaso valor, o inherentemente improbables, o increíbles.[129]

En el caso ante nuestra consideración, tanto Abengoa como American International, impugnan las actuaciones y determinaciones que realizó el Comisionado. No obstante, lo anterior, las partes aquí apelantes, no presentaron ningún método de transcripción de la prueba oral, de tal forma que nos permitiera evaluar si el foro primario, en efecto, realizó determinaciones basadas en prueba errónea, inadmitida, carentes de valor probatorio o contrarias a derecho. Nótese que, como parte del expediente ante nuestra consideración, se incluyeron fragmentos de la prueba oral los cuales no son suficientes para poder llevar a cabo nuestra función revisora. Ante ello, estamos impedidos de intervenir con la apreciación de la prueba que llevó a cabo el Comisionado. Cabe destacar que, es el foro primario, a través del Comisionado, quien está en mejor posición para organizar el desarrollo del caso y, para

---

[127] *Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 177 DPR 345, 356 (2009). *Trinidad v. Chade, supra*, 291.

[128] *Pueblo v. Calderón Álvarez*, 140 DPR 627, 644 (1996). *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 DPR 203, 208 (1994). *Rivera Pérez v. Cruz Corchado*, 119 DPR 8, 14 (1987). S*ierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).

[129] C. Brewer PR, Inc., v. Rodríguez, 100 D.P.R. 826, 1972.

ello, necesita la más amplia flexibilidad y deferencia de los foros apelativos. En virtud de lo anterior y luego de examinar el expediente ante nuestra consideración, colegimos que tanto Abengoa como American International, respectivamente, no colocaron en posición a este tribunal revisor para determinar si incidió el Comisionado en la apreciación de la prueba. Así pues, concluimos que el foro primario no incurrió en los errores señalados, en específico, los errores *A* y *C* del recurso de *Apelación* identificado con el alfanumérico KLAN202200660 y el *primer, segundo, cuarto* y *quinto* error del recurso de *Apelación* identificado con el alfanumérico KLAN202200663.

*-b-*

En el error *B* del recurso de apelación alfanumérico KLAN202200660, American International plantea que erró el foro primario al acoger el *Informe*, toda vez que el mismo determinó que los retrasos de la AEE en obtener los permisos constituyó fuerza mayor, ello, a pesar de que los hechos incontrovertidos demostraban que (i) la AEE nunca notificó a Abengoa de tal fuerza mayor, lo que era un requisito establecido por el contrato para poder invocar esta defensa; y (ii) aún de la AEE haber declarado propiamente la fuerza mayor, Abengoa hubiese sido excusada también por cualquier incumplimiento de su parte bajo el contrato. De igual forma, en el *tercer* error del recurso de apelación alfanumérico KLAN202200663, Abengoa esboza que incidió el foro primario al adoptar la defensa de fuerza mayor para justificar los múltiples incumplimientos de la AEE, cuando tal defensa está imposibilitada como cuestión de derecho por seis razones independientes.

La cláusula 1.11 y 11.2 del contrato que suscribieron Abengoa y la AEE dispone lo siguiente:

> 1.11 "Act of God" – an act of God is construed herein to mean an earthquake, hurricane or other cataclysmic phenomenon of nature not ordinarily occurring. Rains,

windstorms, floods or other natural phenomenon of normal intensity for the particular locality as determined by the preceding five year monthly average from records of the nearest National Oceanic and Atmospheric Administration recording station shall not be construed as an act of God.[130]

1.12 "Force Majeure" – "Force Majeure" shall mean, any cause or circumstances of whatever nature, whether pertaining to a party hereto or its agents, contractors or subcontractors, and which is beyond the reasonable control of and without the fault or negligence of the party claiming the "Force Majeure". "Force Majeure" may include, but is not limited to, acts of God; war; acts of the public enemy; riot; civil commotion; sabotage; federal, state, or municipal actions or regulation; strikes; fire; floods; epidemics, quarantine restrictions; embargoes; unavailability of transport; damage to or destruction in whole or in part of equipment not due to lack of care; inability to obtain raw materials, labor, fuel, or supplies; or any other causes, contingencies, or circumstances within or without the United States, not subject to the parties control, either of a similar or dissimilar nature, which prevent or hinder the performance of this contract.[131]

De igual forma, la cláusula 15.8 de dicho contrato establece

lo siguiente:

15.8 Force Majeure

15.8.1    Neither party shall be held responsible for the nonperformance of this Contract, except for the obligation to pay for work already performed including retainage and to pay money, already due and owed, if performance hereunder is prevented or delayed by "Force Majeure".
15.8.2    If either party is rendered wholly or partly unable to perform it's obligations under this contract because of "Force Majeure", that party shall be excused from whatever performance is affected by the "Force Majeure" to the extent so affected, provided that the non performing party, within ten (10) days after the occurrence describing the particulars of the occurrence and it's estimated duration.
15.8.3    Any delay caused by "Force Majeure" event shall extend the time of the contractor's performance as stated in Article 2 of the Agreement for the time necessary to cover the effects of such a "Force Majeure" events, provided, however, that the party claiming a "Force Majeure" demonstrates that it is being diligent to remedy it's inability to perform and resume in full it's performance under this contract.[132]

---

[130] Apéndice 42 del recurso KLAN202200660, a la pág. 1561.
[131] *Id.*
[132] Apéndice 42 del recurso KLAN202200660, a la pág. 1589.

Luego de un examen minucioso del expediente ante nuestra consideración, coincidimos con la apreciación del Comisionado, toda vez que, en el transcurso de la obtención de los permisos ante la EPA, la AEE mantuvo a Abengoa informada sobre sus diligencias y gestiones a los fines de obtener dichos permisos. Por tanto, es forzoso concluir que la AEE actuó con total diligencia al mantener informada a Abengoa del progreso en la obtención de los permisos, por lo que la dilación de estos respondía a una situación de caso fortuito o fuerza mayor. Nótese, además, que desde que Abengoa suscribió el contrato, tenía conocimiento de que era necesaria la obtención de dichos permisos para comenzar la fase de construcción del Proyecto, la cual estaba sujeta a la obtención de estos.[133]

Posteriormente, las partes llegaron a un acuerdo en la cual emitieron órdenes parciales, a los fines de adelantar labores que no requieran la obtención de los permisos de la EPA. Reiteramos, que, en virtud de lo anterior, Abengoa tenía conocimiento de la dilación en la obtención de los permisos desde el momento en que se firmó el Contrato. Por tanto, toda dilación por las agencias correspondientes relacionadas a la expedición de estos permisos era constitutiva de fuerza mayor y relevo de responsabilidad por parte de la AEE. Así pues, la dilación en la obtención de los permisos no constituía razón justificada para la resolución del contrato por parte de Abengoa. A esos efectos, juzgamos que no cometió error el foro primario con relación al error *B* del recurso de apelación alfanumérico KLAN202200660 ni en cuanto al *tercer* error del recurso de apelación alfanumérico KLAN202200663.

---

[133] Véase Artículo 2 del *Agreement* (contrato) Núm. TSMP-201-004-94. Apéndice 42 del recurso KLAN202200660, a las págs. 1547-1620. En específico, dicha cláusula disponía que: "[The] Contract work shall commence within twenty (20) calendar days of the Order to Proceed which will be issued immediately after receipt of permits necessary for construction and installation of the project".

-c-

Por otro lado, en el recurso de Apelación, KLAN202200663, en su *sexto* señalamiento de error, Abengoa arguye que incidió el foro primario al adoptar el *Informe* del Comisionado haciendo caso omiso a la doctrina del caso *Levy v. Autoridad De Edificios Públicos,* 135 DPR 382 (1994), la cual dispone que el dueño de la obra pague al contratista extra-costes relacionados con un retraso en la obra más allá de lo razonablemente previsible por asuntos bajo la responsabilidad o necesidad del dueño, y que reconoce que cuando se repudia tal obligación radicalmente, el contrato puede ser terminado. Juzgamos que no le asiste la razón a Abengoa en su planteamiento. *Veamos.*

En el caso *Levy v. Autoridad De Edificios Públicos*, supra, el Alto Foro concluyó que un contratista es acreedor de daños por retrasos, cuando el dueño emita órdenes de cambio excesivas o irrazonables, más allá de aquellas consideradas por las partes contratantes. Asimismo, determinó que el dueño de una obra que, mediante demoras extraordinarias, obstaculice directa o indirectamente la ejecución del contrato por parte del contratista, tendrá que indemnizar al contratista por incumplimiento de contrato. No obstante, determinó que no todo incumplimiento de una obligación recíproca conllevará unos efectos resolutorios. Para ello, es necesario que la obligación incumplida sea esencial o que su cumplimiento constituya el motivo del contrato para la otra parte.

Según surge del expediente, el Comisionado determinó que el retraso en el Proyecto no fue irrazonable ni tampoco fue por asuntos atinentes a la AEE. A su vez, el Comisionado concluyó que Abengoa estuvo al tanto de las diligencias y gestiones realizadas por parte de la AEE para obtener los permisos de la EPA. Por último, el Comisionado enfatizó que Abengoa accedió a cumplir con las órdenes parciales, las cuales no requerían la aprobación de la EPA.

Ante este escenario, razonamos que Abengoa conocía las circunstancias y condiciones a las cuales estaba sujeto dicho Proyecto. Por tanto, no correspondía a la AEE pagar a Abengoa extra-costes, debido a que el retraso no fue irrazonable y tampoco estaba bajo el control de la AEE. Menos aún, correspondía la terminación del contrato. En virtud de lo anterior, determinamos que no se cometió el sexto error señalado.

*-d-*

En el *séptimo* señalamiento de error del alfanumérico KLAN202200663, Abengoa alega que erró el foro primario al adoptar un *Informe* que admite que la AEE le ordenó prematuramente la fabricación de costoso equipo sin que la AEE tuviese información de que se emitirían los permisos para instalarlo, ordenó que Abengoa entregara el equipo a las facilidades de la AEE a la intemperie y expuestas al salitre y finalmente, pretendió que el deterioro del equipo y su reparación la subsidiara Abengoa, aduciendo que dicho deterioro fue provocado por las órdenes parciales que emitió la AEE, en violación del contrato y a las doctrinas de *Zequeira v. Corporación de Renovación Urbana y Vivienda,* 83 DPR 878 (1961) y *Danosa Caribbean* v. *Santiago Metal,* 179 DPR 40 (2010), las cuales requieren pago por el dueño por tareas fuera del ámbito de las especificaciones de la subasta. No nos persuade. Veamos.

En el caso *Zequeira v. Corporación de Renovación Urbana y Vivienda,* supra, el Ingeniero Zequeira fue contratado por la Corporación de Renovación Urbana y Vivienda (en adelante, Corporación) para construir unos edificios. Una vez culminado los trabajos, Zequeira presentó los edificios para inspección. No obstante, la Corporación le indicó que no podía aceptar y certificar dicho proyecto, debido a que las terminaciones no fueron realizadas de acuerdo con la carta de interpretación del 15 de septiembre de 1950. Así las cosas, Zequeira realizó esfuerzos para culminar dichas

terminaciones. Trabada la controversia, la última instancia judicial concluyó que la Corporación venía obligada a satisfacer al demandante el costo adicional o aumento en precio en que incurrió en las terminaciones. Para establecer dicho cómputo, el Tribunal Supremo expresó que lo primero era establecer cuánto hubiese sido el precio de la mano de obra y de los materiales para las terminaciones comprendidas en la controversia según los términos del contrato original. Lo segundo, conocer cuánto resultó ser el precio de la mano de obra y de los materiales para las terminaciones comprendidas en la controversia de acuerdo con los términos de la carta de interpretación de 15 de septiembre de 1950. Así pues, revocó la sentencia en todo lo que se refería a la forma en cómo se determinó el aumento en precio.

Por su parte, en el caso *Danosa Caribbean v. Santiago Metal*, supra, la controversia consistía en determinar cuál era el criterio para determinar el importe a que tenía derecho un contratista cuando se pacta un cambio en la obra sin un acuerdo en cuanto al precio. En síntesis, Vissepó & Diez Construction Corp. (en adelante, Vissepó) fue contratado para techar el Coliseo del Municipio de San Sebastián. A su vez, Vissepó contrató a Santiago Metal Manufacturing Corp. (en adelante, Santiago) quien a su vez contrató a Danosa Caribbean, Inc. (en adelante, Danosa) para que realizara el techado del Coliseo. Durante el proyecto se realizaron dos cambios, el segundo de los cambios tenía como propósito cubrir la parte inferior del alero del Coliseo con unas planchas de metal. Posteriormente, Danosa le envió una carta a Santiago en la que cotizó el proyecto objeto de la segunda orden de cambio. Además, Danosa le indicó a Santiago que esperaba por su aprobación para proceder a efectuar el trabajo. Sin embargo, Danosa ya había comenzado a instalar las planchas de metal en el alero del Coliseo. Cónsono con lo anterior, Santiago se responsabilizó por los costos

adicionales de surgir problemas con el diseñador. Sin embargo, no se estableció el precio pactado. Con relación a la segunda orden de cambio, Santiago confeccionó dos documentos, ambos documentos establecían que no serían válidos hasta que fuesen firmados por el dueño de la obra y el contratista. Sin embargo, ninguno de los documentos fue firmado por ambas partes.

Trabada la controversia, Danosa presentó una Demanda en cobro de dinero contra Santiago. El foro primario declaró "con lugar" la demanda presentada por Danosa. Su decisión se amparó en la doctrina de enriquecimiento injusto. Entendió que entre las partes no existía un contrato válido sobre la segunda orden de cambio, toda vez que no se firmó por ambas partes. El TPI entendió que Danosa inició los trabajos sin el consentimiento de Santiago, por lo que asumió el riesgo de que su cotización fuera rechazada. Determinó, además, que Santiago cometió un error el cual intentó subsanar mediante un ajuste en el precio de la segunda orden de cambio. Sin embargo, Santiago no obtuvo confirmación de Danosa para tal reducción en el precio. Por lo tanto, el foro primario dictaminó que Santiago asumió también el riesgo y Danosa no aceptó. Inconforme, acudió ante el foro apelativo, dicho foro revocó al foro primario y determinó que (1) que existía un contrato entre las partes; (2) que el precio convenido en el contrato era el reclamado por Danosa, a saber, $63,680.00, y (3) eliminó la partida concedida a favor de Santiago en concepto de honorarios por temeridad. Insatisfecho aun, Santiago acudió al Tribunal Supremo y, este revocó en parte la Sentencia emitida por el Tribunal intermedio y devolvió el caso al foro primario para que, a tenor con la prueba presentada y admitida, se adjudicara si se pactó el precio de la obra producto de la segunda orden de cambio. Asimismo, confirmó la determinación del foro apelativo intermedio que eliminaba la partida de honorarios por temeridad.

Los casos anteriormente citados se distinguen del caso ante nos, puesto a que allí, los trabajos eran distintos al del caso de autos y las partes no llegaron a un acuerdo válido con relación a las órdenes de cambio. Por el contrario, surge del expediente que Abengoa llegó a un acuerdo válido con la AEE y, accedió a realizar las órdenes parciales para adelantar tareas en el Proyecto que no requirieran los permisos de la EPA. En específico, dichas órdenes parciales fueron promovidas y aceptadas por Abengoa sin reservarse derecho alguno a compensación por costos adicionales. De igual forma, desde el comienzo del Proyecto, Abengoa tenía conocimiento de que era responsable de almacenar y custodiar el equipo hasta la entrega del Proyecto a la AEE.[134] Por tanto, resulta improcedente la pretensión de Abengoa de desligarse de sus obligaciones contractuales para pasar el costo económico del riesgo asumido a la AEE. Por otra parte, dichas tareas no se encontraban fuera de ámbito de las especificaciones de la subasta, y tampoco del Contrato suscrito entre las partes, como sucedió en la jurisprudencia discutida anteriormente. Así pues, la AEE no viene obligada a pagar a Abengoa por dichas tareas. Por tanto, concluimos que no se cometió el séptimo error señalado por Abengoa.

*-e-*

Por otro lado, en el *octavo* señalamiento de error del mismo recurso de Apelación, Abengoa considera que el foro primario incidió al adoptar el *Informe,* arguyendo que el mismo está en contravención a la Regla 42.2 de las Reglas de Procedimiento Civil y lo reiterado por el Alto Foro en *Pérez Vargas v. Office Depot,* 203 DPR 687 (2019), *Andino v. Topeka, Inc.* 142 DPR 933 (1997) y *Torres v. Dávila,* 140 DPR 83 (1996). No le asiste razón a Abengoa. Veamos.

---

[134] Véase Apéndice 42 del recurso KLAN202200660, a la pág. 1572. *Agreement* Núm. TSMP-201-004-94, Cláusula Núm. nueve (9) Quality and Warranties.

Luego de examinar el caso de *Pérez Vargas v. Office Depot,* supra, y el caso de *Andino v. Topeka, Inc.*, supra, colegimos que los mismos no aplican a la controversia ante nuestra consideración, debido a que dichos casos tratan sobre la solicitud de determinaciones de hechos adicionales en casos resueltos mediante moción de sentencia sumaria. Por otra parte, el caso *Torres v. Dávila,* supra, no nos resulta persuasivo a la controversia ante nos, toda vez que trataba sobre la denegatoria de la solicitud de relevo de pensión alimentaria del señor Torres. En específico, el foro primario denegó dicha solicitud sin realizar determinaciones de hechos. A su vez, un panel de este Tribunal confirmó el dictamen el foro primario sin contar con determinaciones de hechos que le permitieran ejercer su función revisora. No obstante, el Tribunal Supremo determinó que, los hechos del caso requerían que el Tribunal de Apelaciones tuviera el beneficio de unas determinaciones de hechos del foro primario que justificaran su conclusión de que el señor Torres podía pagar la pensión sin dificultad alguna. Por lo anterior, revocó al Tribunal de Apelaciones.

Según discutido anteriormente, la jurisprudencia a la que hace alusión Abengoa no es pertinente a la controversia del título. Nótese que, en el caso del título se designó a un Comisionado para atender dicha controversia. Así pues, la controversia trata sobre las determinaciones de hechos que emitió el Comisionado en su Informe. Por otra parte, el caso de *Pérez Vargas v. Office Depot,* supra, y el caso de *Andino v. Topeka, Inc.*, supra, fueron resueltos mediante moción de sentencia sumaria, mientras que en el caso antes nos, se celebró juicio y no se resolvió de forma sumaria.

Según el precitado derecho, las determinaciones de hechos de un comisionado especial, en tanto y en cuanto el tribunal las adopte,

se considerarán como determinaciones de hechos del tribunal.[135] A su vez, Cuevas Segarra explica que, "Los hechos probados son los que se relacionan en la sentencia, ya que ésta no puede ser una recapitulación de la prueba presentada o un informe de todo lo acontecido en el juicio". La regla no requiere detalles innecesarios y minuciosos".[136] De igual forma, el Tratadista expresa que: "el dejar de exponer por separado un hecho probado como una conclusión del tribunal, no es una omisión que motive la revocación de la sentencia dictada en el caso. Esto es así porque ningún tribunal viene obligado a indicar todos los posibles fundamentos en apoyo de una sentencia; y dentro de su sentencia, si ha expresado lo que estima suficientes para su determinación".[137]

En los hechos del caso del título, el foro primario tuvo la oportunidad de revisar dicho *Informe* y determinar si estaba fundamentado en derecho. Según provee la Regla 41.5 de las de Procedimiento Civil, Abengoa objetó el Informe del Comisionado y, en consecuencia, el foro primario celebró una vista, para examinar las objeciones de Abengoa, conforme a dicha regla. Así pues, luego de celebrar una vista, el foro primario acogió las determinaciones de hechos y de derecho que realizó el Comisionado en su Informe, sin impugnarlas o modificarlas. Por tanto, dicho *Informe* se considera como determinaciones de hechos que realizó el foro primario. Vale destacar que, las reglas de procedimiento civil no exigen que las determinaciones del Comisionado cumplan con un formato en específico o que las mismas sean enumeradas. En apoyo a lo anterior, razonamos que no era necesario que el Comisionado expusiera en el *Informe* todo fundamento posible para apoyar sus

---

[135] 32 LPRA Ap. V, R. 42.2.

[136] J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2da ed., San Juan, Publicaciones JTS 2011, T. IV, página: 1229.

[137] J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2da ed., San Juan, Publicaciones JTS 2011, T. IV, página: 1230.

determinaciones. Por todo lo anterior, colegimos que no se cometió el octavo error, imputado por Abengoa.

*-f-*

En el *noveno* y último señalamiento de error del recurso KLAN202200663, Abengoa nos invita a concluir que el foro primario incidió aduciendo que renunció a su función revisora requerida por las Reglas de Litigio Complejo, por lo que debió dirigir el asunto al juez o jueza administrador(a) del foro primario para que se le proveyeran los recursos para resolver el caso del título a favor de la parte apelante. No nos persuade el argumento de Abengoa. Veamos.

Según surge del expediente, el 31 de octubre de 2007, notificada el 6 de noviembre de 2007, el foro primario emitió una *Resolución*[138] en la cual ordenó que se tramitaran los casos del título como casos de litigación compleja. En síntesis, AEE alegó que procedía que se decretase el caso como uno de litigación compleja por el extenso descubrimiento de prueba, la complejidad de las controversias planteadas entre las partes, entre otros asuntos. Por su parte, Abengoa se opuso a la petición de la AEE, alegando que la solicitud era tardía y tendría el efecto de retrasar los procedimientos.

Inconforme con la determinación del foro primario, Abengoa tenía la alternativa de acudir en revisión ante este foro apelativo para revisar dicha determinación. No obstante, no fue hasta que se presentó el recurso de Apelación, el 18 de agosto de 2022, que Abengoa pretendió impugnar la determinación de que se tramitaran los casos del título como casos de litigación compleja. Es decir, Abengoa pretende impugnar la determinación del foro primario, quince (15) años más tarde, por lo que resulta tardío y hasta académico el planteamiento de referir el asunto ante el Juez o Jueza Administradora del TPI. Por otra parte, el Comisionado emitió su

---

[138] Apéndice 12 del recurso KLAN202200660, a las págs. 114-119.

*Informe* el 22 de julio de 2021, por lo que dicho argumento de que determinar el caso como uno de litigación compleja por razón de que tendría el efecto de retrasar los procedimientos resulta tardío, toda vez que el caso se atendió en los méritos y el Comisionado ya rindió su *Informe.*

Las Reglas de Procedimiento Civil, proveen para que el Tribunal nombre a un Comisionado especial en un procedimiento judicial cuando la controversia envuelva asuntos técnicos o complejos. Asimismo, el Comisionado es considerado como un funcionario designado por el Tribunal, en quien se delega determinados poderes para que formule ciertas determinaciones o conclusiones en un procedimiento activo.[139] De igual forma, la designación del Comisionado vendrá acompañada de una orden, la cual especificará y delimitará las funciones de dicho Comisionado.

Del tracto procesal surge que, el 7 de julio de 2011, notificada el 12 de julio de 2011, el foro primario emitió una *Resolución*[140] en la cual nombró al licenciado Rossy García en el caso del título. A su vez, de dicha *Resolución* surge que las partes consintieron a la designación del licenciado Rossy García como Comisionado en el caso del título, sus tarifas y el modo de pago de estas. Además, allí se determinaron los términos, condiciones y facultades del Comisionado.[141] De lo anterior, se infiere que la designación del Comisionado fue con el consentimiento de ambas partes, tanto de Abengoa como de la AEE. Por tanto, resulta tardía la impugnación del nombramiento de dicho Comisionado.

Luego de nombrar al Comisionado y que este lleva a cabo el proceso para el cual fue designado, tiene que rendir un informe sobre todos los asuntos encomendados por la orden del Tribunal, y

---

[139] R. Hernández Colón, <u>Práctica jurídica de Puerto Rico, Derecho procesal civil</u>, 5ta ed. revisada, LexisNexis de Puerto Rico, 2010, sec. 3701, pág. 356.
[140] Apéndice 13 del recurso KLAN202200660, a las págs. 120-130.
[141] *Véase* Apéndice 13 del recurso KLAN202200660, a las págs. 120-130: Poderes del Comisionado.

si se le exige, realizará determinaciones de hechos y conclusiones de derecho las cuales expondrá en dicho informe. Por su parte, el tribunal aceptará las determinaciones de hechos del comisionado o de la comisionada, a menos que sean claramente erróneas. Dentro de los veinte (20) días siguientes a la notificación del informe o del término que disponga el tribunal, cualquiera de las partes podrá notificar a las otras sus objeciones por escrito a dicho informe. A su vez, el tribunal, después de oír a las partes, podrá adoptar el informe, modificarlo o rechazarlo en todo o en parte, recibir evidencia adicional o devolverlo con instrucciones.[142]

Luego de expedir el *Informe* en el caso del título, Abengoa presentó una *Moción y Alegato de Abengoa Solicitando que se Rechace el Informe del Comisionado Especial y que este Tribunal Adjudique la Responsabilidad Contractual en Base a los Hechos no Controvertidos.* Asimismo, solicitó una vista de argumentación oral. Cónsono con lo anterior, el foro primario celebró una vista argumentativa, con relación al *Informe* rendido por el Comisionado y las objeciones presentadas por Abengoa.  Luego de examinar los argumentos esgrimidos por las partes del título, el 18 de julio de 2022, notificada el 19 de julio de 2022, el foro primario emitió una *Sentencia Parcial y Orden.*[143] Mediante la *Sentencia Parcial,* el foro *a quo* acogió el *Informe,* haciéndolo formar parte de la *Sentencia Parcial* emitida.

Nótese que, una vez se rindió el *Informe,* Abengoa presentó su objeción mediante moción. Por su parte, el foro primario celebró una vista argumentativa para evaluar las objeciones de Abengoa respecto al Informe, en cumplimiento con la Regla 41.5 de las de Procedimiento Civil. Una vez, celebrada la vista, el foro primario

---

[142] 32 LPRA Ap. V, R. 41.5.
[143] Apéndice 38 del recurso KLAN202200660, a las págs. 1538-1540.

entendió que el Informe del Comisionado se emitió conforme a derecho y sustentado en la prueba presentada por las partes.

En virtud de lo anterior, determinamos que tanto el Comisionado como el foro primario actuaron de conformidad a la Regla 41 de las de Procedimiento Civil. Así pues, concluimos que no se cometió el *noveno* error antes señalado.

### KLCE202201145

En el recurso de *Certiorari* KLAN202201145, UNIPRO en sus dos (2) señalamientos de error nos plantea, en síntesis, que el foro primario incidió tras abstenerse de intervenir en torno a una solicitud de orden de pago, a favor de UNIPRO hasta tanto este tribunal revisor dispusiera de los recursos KLAN202200660 y KLAN20220663.

Tras evaluar minuciosamente el recurso presentado ante nos por UNIPRO, los señalamientos de error, así como la posición de las partes recurridas y el expediente en su totalidad, razonamos que no procede la expedición del auto de *Certiorari* solicitado. Conforme a nuestro ordenamiento jurídico, la expedición de un auto de *Certiorari* al amparo de la Regla 52.1 de las Reglas de Procedimiento Civil[144], no opera en el vacío; tiene que anclarse en una de las razones de peso que establece la Regla 40 del Reglamento del Tribunal de Apelaciones.[145] En el presente caso, razonamos que no se configuran ninguna de las instancias que justificarían la expedición de este recurso discrecional. Luego de haber revisado los señalamientos de error esgrimidos por UNIPRO y los fundamentos en apoyo, según surgen de la *Petición de Certiorari,* los mismos no lograron activar nuestra función discrecional en el caso de autos. Consideramos, además, que, al aplicar la norma de abstención apelativa en este momento, conforme al asunto planteado, no

---

[144] 32 LPRA Ap. V, R. 52.1.
[145] 4 LPRA Ap. XXII-B, R.40.

constituirá un rotundo fracaso de la justicia.  Es por todo lo anterior que, no atisbamos razón para intervenir con el dictamen recurrido. Por tanto, acordamos *denegar* la expedición del auto de *Certiorari* en el recurso KLCE202201145.

IV

Con relación a los recursos **KLAN202200660** y **KLAN202200663**, por los fundamentos que anteceden, **se confirma** la *Sentencia Parcial* apelada.

Por otro lado, en cuanto al recurso **KLCE202201145**, se *deniega* la expedición del auto de *Certiorari*.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones